Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/21/2020 08:07 AM CDT

State of Nebraska, appellant,
v. Esai P., appellee.

___ N.W.2d ___

Filed April 21, 2020.    Nos. A-19-1120, A-19-1121.

1.  **Criminal Law: Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** A motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion.
2.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3.  **Courts: Juvenile Courts: Jurisdiction.** In conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile.
4.  ____: ____: ____. In order to retain jurisdiction over a juvenile, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor.
5.  **Courts: Juvenile Courts: Jurisdiction: Proof.** In a motion to transfer to juvenile court, the burden of proving a sound basis for retention lies with the State.
6.  **Courts: Juvenile Courts: Jurisdiction.** Neb. Rev. Stat. § 29-1816(3)(a) (Cum. Supp. 2018) requires the trial court to consider all the evidence and reasons presented by both parties before a case may be transferred to juvenile court.
7.  ____: ____: ____. Although it is preferable for a district court to refer to all the statutory considerations set forth in Neb. Rev. Stat. § 43-276(1) (Supp. 2019), the statute does not require it to do so.
8.  **Courts: Juvenile Courts: Jurisdiction: Evidence.** There is no arithmetical computation or formula required in a court's consideration of

the statutory criteria or factors. There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute.

9. ____: ____: ____: ____. When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the district court abused its discretion in refusing to transfer the case to juvenile court. Similarly, when a district court's basis for granting a transfer to the juvenile court is supported by appropriate evidence, it cannot be said that the district court abused its discretion in granting the transfer.

Appeals from the District Court for Douglas County: Marlon A. Polk, Judge. Reversed and remanded for further proceedings.

Donald W. Kleine, Douglas County Attorney, and Jameson Cantwell for appellant.

Jeffrey S. Leuschen for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Bishop, Judge.

## I. INTRODUCTION

The State appeals the orders of the Douglas County District Court which transferred two pending criminal proceedings filed against 16-year-old Esai P. to the separate juvenile court of Douglas County. Because there was substantial evidence supporting the retention of the cases in the district court for the sake of public safety and societal security, and there was a lack of evidence demonstrating that any further rehabilitation through the juvenile system would be practical and nonproblematical in the limited time left under the juvenile court's jurisdiction, we conclude the district court abused its discretion in granting the transfer of both cases to the juvenile court. We therefore reverse the district court's orders granting Esai's motions to transfer the two cases to juvenile court, and we remand the causes for further proceedings in the district court.

## II. BACKGROUND

### 1. Incidents Leading to Criminal Charges

#### (a) Robbery and Assault Charges

In case No. CR 19-3258 (appeal case No. A-19-1120), an information was filed in the district court on September 6, 2019, charging Esai with two counts: (1) robbery pursuant to Neb. Rev. Stat. § 28-324(1) (Reissue 2016), a Class II felony, and (2) second degree assault pursuant to Neb. Rev. Stat. § 28-309(1)(a) (Reissue 2016), a Class IIA felony.

These charges stemmed from an incident that took place on June 16, 2019, in which a male victim was set up to believe he would be selling marijuana to a certain female, but when he arrived at the place to meet her, she was present along with "two other Hispanic males," one of whom was Esai. The victim knew Esai from high school. Esai punched the victim in the face, and when the victim and Esai began to fight, Esai told the other male to shoot the victim in the leg, which he did.

The female involved admitted she set up the victim to "get robbed." She said that she was with Esai and Kevin Solorzano and that she saw both of them with firearms. Esai had a silver firearm, and Solorzano had a black firearm. She heard two shots but did not see who did the shooting. Marijuana was taken from the victim, but the victim did not know who took it. The victim almost had to have his leg amputated; eight operations were necessary to save his leg.

#### (b) Attempted Assault and Firearm Charges

In case No. CR 19-3257 (appeal case No. A-19-1121), an information was filed in the district court on September 6, 2019, charging Esai with eight counts: attempted assault in the first degree pursuant to Neb. Rev. Stat. §§ 28-308(1) and 28-201(4)(b) (Reissue 2016), a Class IIA felony (counts 1, 2, 3); use of a deadly weapon (firearm) to commit a felony pursuant to Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Reissue

2016), a Class IC felony (counts 4, 5, 6, 8); and discharging a firearm at an inhabited house, occupied building, or occupied vehicle pursuant to Neb. Rev. Stat. § 28-1212.02 (Reissue 2016), a Class ID felony (count 7).

The charges in this case stemmed from an incident which took place on June 19, 2019. At approximately 12:14 p.m., two detectives with the Omaha Police Department, along with an intern, were conducting an investigation and were driving in an unmarked police car when they observed what they believed to be suspicious activity. They saw a Honda sedan "parked kind of cockeyed" in the street, "running," and with someone in the driver's seat. They then saw "two Hispanic male juveniles with their hoods up, kind of running or jogging through a yard" enter the awaiting vehicle which then immediately left the area. The detectives in the unmarked car, who were not in uniform, followed the Honda from a distance while attempting to get a marked cruiser into the area. They followed the Honda down an alleyway and made several turns, following "from approximately ten car lengths" and "maintaining visual of the vehicle the entire time." A "Hispanic male juvenile . . . kind of leaned his upper body, head and torso, out of the passenger side of the vehicle and motioned . . . towards them to kind of continue following them"; it resembled a "bring-it-on" type of motion. The detectives in the unmarked car continued to follow for several more turns and ultimately followed the Honda down an alleyway where, after briefly losing sight of the Honda, they saw it parked near a house at a specific address on Pine Street in Omaha, Nebraska, and also saw "two Hispanic male juveniles" exit the Honda. The detectives and the intern, who were parked in an alleyway across from the house, were then "almost immediately" fired upon from the direction of the house. One detective saw somebody in a shooting stance in the driveway of the house; the intern saw someone step off the front porch of the house into the driveway who then fired upon them. The detectives "ducked down in their vehicle," and once the gunfire ceased, they checked on the intern and

then grabbed their bulletproof vests and advanced toward the house. They observed two different caliber shell casings and beer cans; the Honda they had been following left the area, and the detectives did not see if anybody else got into it. The detectives also observed several individuals running between houses, going westbound. The detectives described "all the individuals that they could see as being Hispanic males between the ages of 17 and 20."

Another detective with the homicide unit investigated and documented the scene at the Pine Street residence. A SWAT team was brought in to enter the house once a warrant was issued. In addition to observing several beer cans in the driveway, the detective also found six shell casings in the driveway, "four of those were .45 caliber shell casings, two of them were .32 caliber shell casings." According to the detective, the two different caliber shell casings indicated that more than one individual discharged a firearm. Next to the detectives' car were "two spent projectiles, copper jacketing from the bullets that were fired." There were "two noticeable defects" in the detectives' car, one underneath the driver's side headlight and the other on the front driver's side quarter panel. The two "defects" were different in size or diameter; the larger defect appeared in the front driver's quarter panel and a smaller one appeared under the driver's side headlight. The detective acknowledged that the defects were consistent with there being two different shell casings located nearby. A ".32 caliber Kel-Tec P-32 handgun" was located nearby. The detective further confirmed that a .45-caliber and .32-caliber firearm were both capable of inflicting serious bodily injury or death.

Several suspects were taken into custody that same day. Officer Brandon Braun, who worked in gang intelligence, conducted interviews of the suspects. According to one 16-year-old suspect, there were seven people at the Pine Street residence that day. They were "barbecuing, drinking, looking over at guns." The suspect and a couple others (not Esai) in the "Playboy Surenos" gang decided to do a "beer run, which

is where . . . you go and steal beer from a liquor store or gas station" because no one was of age. The suspect was driving the Honda, and on the way to the gas station, they noticed graffiti representative of the "6500" gang, so they decided to spray paint that graffiti and "apply their own graffiti or tagging." It "was a pretty highly trafficked area," and they knew a "6500" gang member lived close by, "so they got nervous and started to leave that area." When they left, they observed a car behind them. They made several turns, and the car kept following them. They returned to the residence on Pine Street, "where they had previous associates there, and they knew there were guns there." The suspect called the person who lived at the Pine Street residence and communicated something about the "six-five's" being behind them; "he relayed that they were being followed by a rival gang," and he told them to get ready. Officer Braun agreed that the people in the Honda and the people at the Pine Street residence believed the Honda was being followed by rival gang members and were afraid "they were going to be shot at or shot and killed."

When the Honda arrived at the residence, the two passengers in it exited and "ran out as fast as they could, and within seconds, there were shots fired from the [residence]." The driver took off in the Honda, drove about a block or two, and then a "bunch of his associates from that residence jumped over a fence and then proceeded to get into his vehicle." They tried to get to Council Bluffs, Iowa, but "got lost on some back roads" and were subsequently pulled over by the police. Everyone in the Honda was taken into custody. The 16-year-old driver identified the seven people who were at the residence, including Esai.

Officer Braun interviewed a 17-year-old suspect who described "pretty much the same thing." He was involved in the "beer run" and was one of the people "crossing out the 6500 tagging." This suspect indicated that on the way back to the Pine Street residence, the other person in the front passenger seat of the Honda "was throwing up what he considered

gang signs towards the vehicle that was following them." The 17-year-old suspect described a cell phone call between the driver and the person at the residence; he "was scared that there was going to be a shoot-out" once they got to the residence. This suspect specifically described the firearms they were looking at before the beer run. He described a black and silver .45-caliber firearm that he said "was kind of the community gun that their gang kind of passed around a lot." He also described the .32-caliber firearm and said it was in Esai's possession. During the shooting, this suspect was running, and when he got back to the residence, he observed one person with the .45-caliber firearm and Esai with the .32-caliber firearm. This suspect subsequently ran, jumped a fence, and got into the Honda.

Officer Braun also interviewed Solorzano, who was 18 years old at the time. Solorzano was at the residence during the beer run, but his statements were similar to the others regarding the drinking, the barbecue, and who was at the residence. Solorzano admitted shooting at the detectives' car. He had been shot a week or two prior in a gang shooting and "was afraid it was the same gang that they had been in a gun battle with." Solorzano was aware of the cell phone call from the Honda, and he went out with a gun to "protect his associates." Solorzano used the .45-caliber weapon, and he identified Esai as being the other shooter. Solorzano indicated he meant to fire once, but believed he fired twice. After the shooting, Solorzano handed the .45-caliber firearm off to the person who had been in the Honda's front passenger seat, and then he ran, jumped the fence, and got into the Honda with the others. The .45-caliber firearm had not been located by the time of Esai's motion to transfer hearing.

According to Officer Braun, Esai was not taken into custody the day of the incident, but a warrant for his arrest was issued that night. It took about a month for Esai to be taken into custody. Numerous efforts were made to try to locate Esai. He was finally located at a residence with a member of the

Playboy Surenos gang. The other gang member also had an arrest warrant; a search of the residence turned up a firearm inside a bag, but not the .45-caliber firearm from the shooting incident. Officer Braun interviewed Esai for a couple of hours about the June 19, 2019, shooting incident. Esai "made statements referring" to being a shooter on June 19. He acknowledged being in possession of the .32-caliber firearm, but said that he did not know it was the police and that he was scared because of the prior shooting with another gang. Esai indicated that his firearm had been provided to him by the same female who had lured the robbery victim in Esai's other case. She had apparently stolen it from her brother.

### 2. Hearing on Motion
### to Transfer

On October 7, 2019, Esai filed a motion to transfer each case to the separate juvenile court of Douglas County. A hearing on both motions took place on November 21.

### (a) State's Evidence

At the November 21, 2019, hearing, several law enforcement officers testified about the events which took place on June 16 and 19, as described previously. A number of exhibits were also offered and received without objection.

In addition to describing his interviews with the suspects involved with the June 19, 2019, shooting incident as set forth previously, Officer Braun also testified about his "long history with Esai." He testified he first had contact with Esai approximately 1½ years ago when Esai was about 14½ years old; he described Esai as "one of those kids that at the time I thought was kind of borderline." He had investigated Esai "for a couple of different gang-related crimes, with gun[] possessions and shootings," and made "special trips to him almost on a weekly basis . . . trying to help this kid out." Officer Braun was trying to keep Esai away from gang life; Esai had "a rough upbringing" and "need[ed] a lot of assistance." Esai "expressed a large affinity for guns" and had

shown Officer Braun "numerous pictures of guns." Officer Braun met with Esai 10 to 12 times over the course of a year, talking about gang life generally and what Esai was doing. Esai was "always very cordial, very friendly, but [was] also a very determined young man," meaning "hard-headed," in Officer Braun's opinion. According to Officer Braun, "[N]o matter what I was going to say, he was going to do and lead the life that he want[ed]."

Officer Braun recalled arresting Esai a couple weeks or a month prior to the shooting incident. He had identified Esai in some photographs from the scene of a robbery case. Officer Braun and another detective went to Esai's house to talk to him about it, and Esai was very nervous. They were able to get permission to search the house, and they located a firearm in the upstairs of the house.

According to Officer Braun, the Playboy Surenos gang is a "Hispanic Surenos nationwide gang, mainly based out of Mexico, California, here, and Memphis, Tennessee." The Playboy Surenos in Omaha is "a violent street gang" that has been involved in "numerous shootings, narcotics, a lot of gun history with that gang." The "6500" gang "is a neighborhood gang started here in Omaha, in the . . . Q Street region in South Omaha." Although only around for a couple of years, "they've had a violent tendency or rivalry against Playboy Surenos, at least at that time they did." Officer Braun agreed that "there's not great blood between these two gangs."

Officer Braun testified that Esai is a documented member of the Playboy Surenos and has been involved in violence related to that gang. He identified Esai in photographs (exhibit 1) taken from Esai's Facebook account that week and pointed out that Esai was "throwing up" a Playboy Surenos gang sign in some of the photographs. In one photograph, Esai and another individual "appear[ed] to be holding firearms towards the camera," but the firearms were "slightly blocked out." In some photographs, Esai was with "South Omaha gang members."

On cross-examination by Esai's attorney, Officer Braun was asked if he thought Esai "still stands a chance to be able to turn things around?" Officer Braun responded:

> Like I said, this is my opinion, I really like the kid. He's very smart, very intelligent, very personable. You won't find a person that does not like Esai . . . . I also know that he has an extreme affinity for guns. He's shown me, from his own cell phone, he's approximately had ten different guns between the age of 13 and 16, which is a huge number for a child, a gentleman that age. He's also shown extreme affinity for the gangs and the gang life. No matter how many times I talk to him, he hangs around with the same guys, doing the same thing, the same — he puts himself in these same situations that are very dangerous.

### (b) Defense's Evidence

After the State rested, two witnesses were called by the defense. Heather Moran, an employee with juvenile probation, testified about the different types of services available for "high-risk youth," such as foster care; group homes; treatment group homes; psychiatric residential treatment; the Youth Rehabilitation and Treatment Center (YRTC) in Kearney, Nebraska; trackers; electronic monitoring; "outpatient for substance, mental health, intensive outpatient"; and services inside the home, such as multisystematic therapy and intensive family preservation. She noted that Esai was currently placed at the Douglas County Youth Center.

Moran started working with Esai in February 2019 when he was adjudicated for a charge related to visual pornography; Esai had taken a video of two juveniles having sex and that video was on a cell phone. But since he had been in "custody a couple times," and "he was also on run," Moran had only supervised him for "about a month and a half." Moran explained that "on run" meant Esai left the family home without permission and his electronic monitoring device "died."

When he did not return, a warrant was issued and was still pending in Sarpy County, Nebraska. According to Moran, Esai had been placed at his grandmother's house through the court system, but there was a "two-week point" in "late February, beginning of March," when he was at his mother's house in Omaha. Esai was not doing well at his grandmother's house. "He didn't want to follow the rules. There was lots of arguing." Moran said he was "placed there at Mom's as respite" and kept there "while we were looking for group homes and stuff." Esai was arrested at his mother's home in March for attempted robbery, use of a gun by a prohibited person, and tampering with evidence.

Moran testified that Esai had been offered "pretty much all the services" available "in the community." She had previously started applications for a group home setting, but stopped looking once he was detained on the current charges. Canyon State, located in Arizona, is the only out-of-state group home used by juvenile probation. According to Moran, a crime of violence does not preclude acceptance into a group home. Moran said that commitment to YRTC had not yet been offered to Esai. Moran discussed programming at YRTC, such as therapy or treatment for "substance or mental health" and "some cognitive behavioral groups." She mentioned aggression replacement training and moral reconation therapy. Moran described Esai as always being polite, "never had any issues with disrespect," but he has "struggled with following a lot of the rules that we put down." When asked whether there were services within the juvenile court system from which Esai could benefit, Moran responded, "I'm not sure, to be honest." If Esai was transferred to juvenile court, Moran intended to recommend YRTC. She was not sure Esai would benefit from YRTC; it would be "up to Esai on that part." Moran agreed that there are services available to Esai at YRTC which would not otherwise be available to him in adult court. She also agreed that given the current charges, there were no in-community services available to Esai. If the case was moved to the juvenile court, Moran

would be recommending YRTC. She did not think any group homes in Omaha would accept Esai given the current charges. An out-of-state group home, such as Canyon State, might be an option, but "it would be up to [Canyon State]" if it would take someone or not. Even if a court ordered that Esai go to Canyon State, it would be up to Canyon State "whether they take a youth into their program or not." Moran worked with a few juveniles accepted to Canyon State, but the charges involved were lesser charges than those against Esai. Moran responded affirmatively when asked by the district court whether Canyon State dealt with gang prevention.

Esai's grandmother testified; she is Esai's legal guardian. Esai had lived with her since he was about 3 years old, and she became his legal guardian in 2007. The grandmother said that Esai's mother had "drug problems" and that Esai's father was deported to Mexico when Esai was 8 years old. According to the grandmother, Esai had been a "straight A student, honor roll," until he got in trouble in high school. She felt his behavior changed after the death of her husband, Esai's grandfather, in October 2015. The grandmother had been having problems with Esai for about 2 years. If Esai did not get what he wanted, "he would get disrespectful" with her. As an example, if she told him to clean his room, Esai would respond, "No, I ain't gonna." Esai was never violent toward his grandmother, but he had difficulties with rules related to curfews. When he was about 14 years old, Esai started meeting new friends in high school who the grandmother did not think "were a very good influence on him." Esai started high school at one school but had to leave and attend another high school because he was getting into trouble. Presently, because he was in custody at the Douglas County Youth Center, he was attending yet another school.

### (c) Closing Arguments

In closing arguments, the State noted that under Neb. Rev. Stat. § 43-276 (Supp. 2019), "there are several factors the

Court must consider when determining whether to transfer a juvenile . . . to Juvenile Court." The State listed a number of those factors: violence, motivation, the juvenile's age and the age and circumstances of others involved in the offense, the juvenile's history, public safety, the juvenile's best interests balanced against public safety, the amount of time left before the juvenile ages out of juvenile court at age 19, prior gun charges or convictions, prior juvenile court orders, and whether the juvenile is a member of a street gang. The State pointed out that "almost the majority" of the factors "are checked off in this circumstance."

The State emphasized the presence of violence and motivation for the offense, but conceded (with regard to the Pine Street shooting incident) that "none of the shooters in these cases believed the officers to be officers, they believed them to be opposing gang members." However, the State argued this "still shows violence and it still shows their motivation is to shoot at other gang members." The State further argued, "It's not self-defense type of violence. It's not violence that otherwise could be explained." The State added, "This was the worst kind of violence, which leads to many of the homicides and many of the gun violence we have in Omaha."

The State directed the district court to the exhibits, generally noting Esai's juvenile history: Esai took his grandmother's vehicle and left without her permission in July 2017; Esai shoplifted at a department store in October 2017 and was cited; Esai and others stole a vehicle from a high school parking lot in March 2018; Esai was charged with assault for an incident where he "hopped out" of a vehicle and started punching a victim who was jogging in August 2018; and Esai was charged with armed robbery in March 2019. And while the present charges were pending, Esai engaged in criminal impersonation, as well as engaged in assault by a confined person. The assault occurred at the Douglas County Youth Center where Esai was being detained; according to the State, Esai grabbed

a 34-year-old worker by the hair, pulled her backward, and attempted to steal her cell phone.

The State urged retention in adult court because "we need longer to have a thumb on Esai." The State noted that there was a limited amount of time services could be offered through the juvenile court and that some of the same services available at YRTC could be offered in the district court whether he was placed on probation or placed in custody. The State indicated, "There's nothing that says this Court couldn't send him to Canyon State if he's put on probation on this case at some point."

On the other hand, defense counsel argued that although Esai does have multiple juvenile offenses, these problems only began in the last 2 years or so. Defense counsel attributed the problems with the death of Esai's grandfather, who had been the "one father figure role" in Esai's life. At the same time, Esai was transitioning into high school where he hung out "with the wrong people." And specifically with regard to the shooting incident involving the detectives, defense counsel argued that "these young men were . . . scared for their lives. And while . . . it's due to potential gang involvement, the fact of the matter is . . . this was not something they were doing as aggressors. . . . One of them had just been shot . . . weeks before. . . . [T]hese are teenagers, and they're making poor decisions."

Defense counsel also suggested that all juvenile court services had not yet been exhausted, "including those which specifically can address gang involvement for youths." He said, "[T]he application process for him to even explore group homes has not been exhausted." Defense counsel argued that Esai "does understand how serious this is, and it's kind of been a reality check, especially being in custody." Defense counsel acknowledged that "there were some poor decisions made," but reasoned that was "partially due to the fact that he is only 16 years old," and stated that 2 years "would be a lot of time for him to participate in services."

(d) District Court's Verbal
Findings and Decision

Immediately following closing arguments, the district court stated:

> [Esai], I'm sure, as you're sitting there, you do not want to hear a lecture from me, because I'm sure you've heard enough of them, but I want to be real clear that this is not cool, because I see where this is going. It's basically only two options, the way you are going, you're either going to be out of the gang or you're going to be the leader of the gang, because you're not a follower. You're not one influenced by others. You're going to lead the gang, or you're going to be out, there is no in-between, because you are not a follower. You're too smart for that, and you know the game, and you know where this is going.
>
> And in weighing all of the factors, this goes back and forth with you. Obviously, it's not in your best interests to be in adult court, and if there's any chance that you could be saved, then it would not be in society's best interests that you be in adult court. And in my opinion, the only service that could possibly help would be Canyon State. I think [Esai] needs to be put out of Nebraska. I think he needs to be — It's the only possible way. He needs to be shipped to Canyon State and see if there's any way they can help him save himself.

The State suggested that before the district court made a final decision, it could order an application to Canyon State and see whether it would or would not accept Esai. The State inquired of the court, "If Canyon State's not going to accept him, I think wouldn't that change your thoughts?" The court replied:

> I guess if Canyon State doesn't accept him, we're probably even in more trouble, because I think just being 16 years old, I just don't think that our prison system is going to benefit him at 16 years old.

I mean, there's — The Court believes that it's in the — weighing the factors, it's in the overall best interests that the Juvenile Court get jurisdiction over him and that the Court wants to make sure that the Juvenile Court knows that this Court recommends that he be sent to Canyon State, that an application be made and that he be sent to Canyon State. So the Court is going to grant the Motion to Transfer to Juvenile Court and wants either defense counsel or [the State's counsel] to at least make sure that the Courts — my recommendation is submitted to the Juvenile Court, and that's going to be the order of the Court.

### 3. DISTRICT COURT'S ORDERS

On November 21, 2019, the district court entered the same order in both cases. The order noted the hearing on the motion to transfer held that day, and then stated, "Evidence was adduced and after having considered the criteria set forth in Neb. Rev. Stat. §43-276 (Reissue 2004), and for the reasons stated in open court, [Esai's] motion to transfer this case to the [juvenile court] is hereby sustained."

The State appealed in each case, and we have consolidated the appeals for disposition. Any references to either party's brief in this opinion shall be to the briefs filed in case No. A-19-1121.

## III. ASSIGNMENTS OF ERROR

The State contends in both cases that the district court abused its discretion in transferring the matter to juvenile court (1) without first reading and considering the police reports related to the investigation of the crimes charged and (2) by not sufficiently making the required findings pursuant to § 43-276. The State also claims the district court abused its discretion (3) because a sound basis existed for retaining the matter in the district court and denying the motion to transfer to juvenile court.

## IV. STANDARD OF REVIEW

[1,2] A motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

## V. ANALYSIS

### 1. Jurisdiction

When a juvenile seeks to transfer a criminal case from adult court to juvenile court, Neb. Rev. Stat. § 29-1816(3)(c) (Cum. Supp. 2018) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal." Section 29-1816(3)(c) further states that upon entry of such an order, "any party may appeal to the Court of Appeals within ten days." On November 21, 2019, the district court entered orders in both cases granting Esai's motions to transfer his cases to juvenile court, and the State filed its notice of appeal in each case on November 25; the State's appeal in each case is timely.

### 2. Motion to Transfer to Juvenile Court

#### (a) Legal Framework

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district court over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Esai in both cases put him within this category of juvenile offenders,

and in both cases, the State filed the charges against Esai in the district court.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer to juvenile court pursuant to § 29-1816(3). In the instant case, when Esai moved to transfer his cases to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at a juvenile transfer hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court[.]" § 29-1816(3)(a).

[3-5] As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

#### (b) Evidence

We have set forth above the testimonial evidence and arguments presented at the hearing on Esai's motion to transfer. One of the errors assigned by the State on appeal is that the district court abused its discretion by not first reading and considering "all of the evidence adduced by the State to support retention of the crimes charged in District Court." Brief for appellant in case No. A-19-1121 at 15. This alleged error stems from the district court, which rendered a decision before reviewing the exhibits submitted at the hearing.

[6] In *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018), the State made the same argument related to the district court, which did not first review approximately 141 pages of police reports offered into evidence. In that case, as occurred here, the district court immediately proceeded to render its findings and decision after closing arguments. The Nebraska Supreme Court pointed out that § 29-1816(3)(a) requires the

trial court to consider all the evidence and reasons presented by both parties before a case may be transferred to juvenile court. It therefore concluded that the district court erred by failing to review and consider the police reports offered by the State. However, the Nebraska Supreme Court also noted that our harmless error jurisprudence recognizes that not all trial errors result in reversal; it is only prejudicial error which requires a reversal. *State v. Tyler P., supra*. When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case. *Id*. The Nebraska Supreme Court concluded that although the police reports provided detailed information, the facts set forth in the reports were similar in nature to the allegations in the information and the facts recounted by witness testimony, and that thus, "the error of not reviewing the police reports, in light of the totality of the record, did not influence the outcome of the case." *Id*. at 973, 911 N.W.2d at 269-70.

For the most part, the same can be said about Esai's cases before us. The State does not direct us to anything specific in the exhibits which might have influenced the district court's decision to transfer the cases to juvenile court. The exhibits consist of six photographs (exhibit 1) taken from Esai's Facebook account, all of which were discussed during the hearing, and approximately 273 pages of juvenile court records and law enforcement reports (exhibits 2 through 12). Briefly summarized, the exhibits were as follows: exhibit 2 includes court documents related to Esai's juvenile adjudication for the visual depiction of sexually explicit conduct in September 2018; exhibit 3 includes court documents related to Esai's juvenile adjudication for stealing a car in March 2018; exhibit 4 consists of a "Person Profile Selection Screen" and a "Past Record Selection Screen"; exhibit 5 is an "NCJIS Nebraska Criminal History" printout; exhibit 6 contains law enforcement documents related to Esai's grandmother, who filed a missing juvenile report and notified police in July 2017 that Esai left

the residence with her vehicle without her permission; exhibit 7 contains law enforcement documents related to Esai's shoplifting incident at a department store in October 2017; exhibit 8 contains law enforcement documents related to a car that was stolen out of a school parking lot in March 2018 (for which Esai was adjudicated); exhibit 9 contains law enforcement documents related to a July 2018 incident involving a 16-year-old victim who was jogging when a vehicle pulled up and Esai jumped out of the vehicle and attempted to punch the victim; exhibit 10 contains law enforcement documents related to an assault and attempted robbery involving Esai in March 2019; exhibit 11 contains law enforcement documents related to Esai's criminal impersonation charge; and exhibit 12 contains law enforcement documents related to Esai's assault of the Douglas County Youth Center employee. All of the incidents discussed in the exhibits were either mentioned in the course of witness testimony or were otherwise briefly referred to by the State in its closing argument.

We will set forth the details contained in exhibits 10, 11, and 12, since these documents involve incidents close in time to the June 2019 offenses charged in the present cases, and although mentioned in the State's closing argument, there was limited or no testimony regarding each incident.

Exhibit 10 provides details related to a March 2019 incident which took place just months before Esai's involvement in the two June incidents at issue in the present cases. Exhibit 10 contains documents related to an assault and attempted robbery of a 16-year-old victim that took place on March 3. An investigation that day revealed that Esai was at the scene of the crime based on his "GPS ankle monitor." When police arrived at Esai's mother's house, where he was living at the time, Esai's mother told him to come downstairs because the police were there. The officers heard something drop to the floor, followed by a person running down a hall and then drawers being opened. Esai came down the stairs breathing fast and appearing very nervous. He told his mother not to sign anything and not

to let the officers conduct a search. After Esai was removed from the residence, his mother gave her consent for the officers to search the residence. A "Smith and Wesson M&P 40" black handgun had been tossed behind some large wooden drawers that opened into attic space in the upstairs area occupied by Esai. Esai was booked for attempted robbery, use of a firearm to commit a felony, felon in possession of a firearm, and tampering with evidence.

L.G., another suspect in the March 2019 assault and attempted robbery, was questioned; Esai was then questioned based on information provided by L.G. Esai began by talking about having the firearm that was found at his house since August 2018. According to Esai, he had "'jacked it from some white guy from Iowa.'" He claimed that on March 3, L.G. picked him up, along with two others who Esai would not name. Esai had not met the victim before but knew him through Facebook. Esai knew the victim had an "I phone X" that Esai wanted to take in order to resell it for money. Esai called the victim and told him they would pick him up. After the victim got in the car, Esai pulled out his firearm, pointed it at the victim, and told him to give Esai the cell phone. The victim denied having it, so Esai started to check the victim's pockets. When the victim "clinched up" and refused to give up the cell phone, Esai punched him twice with his fists. When the victim still refused to give Esai the cell phone, Esai hit him five to six times with the firearm. L.G. stopped the car and told the victim to get out. According to Esai, no one else in the car knew what was going to happen. Esai gave permission to search his cell phone but would not provide his passcode.

Exhibits 11 and 12 both relate to incidents involving Esai after the commission of the June 2019 offenses. Exhibit 11 contains documents pertinent to the criminal impersonation charge filed against Esai. As previously noted, Esai could not be located after the June 19 shooting incident on Pine Street. On July 30, two police officers drove past two juveniles

walking alongside a street, and when one of the officers looked in the rearview mirror, he observed a "Hispanic male" reach into his waistband. The officers turned their vehicle around, and the person who had been reaching into his waistband, Esai, took off running. He was subsequently caught and handcuffed. Esai first refused to identify himself, but then gave the name of another person who was about the same height and weight as Esai. Esai was asked who his guardian was, and Esai gave the correct guardian's name and address for the named individual. The officer released Esai, since he thought Esai was who he claimed to be and the officer did not find anything of evidentiary value. At that time, Esai was in the law enforcement system with several felony warrants related to the June incidents. On August 1, Esai was located by the fugitive task force and was taken into custody. According to a police report, Esai admitted that "he lied about his name to avoid capture and was laughing about the incident." Esai was then booked at the Douglas County Youth Center for criminal impersonation.

Exhibit 12 reveals a discrepancy regarding Esai's assault of a staff member on October 6, 2019, at the Douglas County Youth Center where Esai was being detained. The State argued in closing argument that Esai had grabbed a staff member by the hair. Exhibit 12 reflects that Esai approached a staff member from behind while she was sitting in a chair at a desk near his cell. He pulled her radio out from her holster and threw it on the ground. He then grabbed both of her arms, forcefully pulling her arms straight back and dragging her backward in her chair toward his cell. He hollered out to two other detainees (identified as documented members of the Playboy Surenos gang), one of whom tried to cover a camera with a wet paper towel, and then took the staff member's cell phone from her bag. The cell phone was subsequently dropped on a table when the staff member called for help. All three juveniles involved refused to speak about the assault.

Exhibits 10, 11, and 12 show an escalation in Esai's behaviors in 2019 despite past intervention and efforts to rehabilitate him through the juvenile court system throughout 2018. These exhibits, along with the juvenile court records (exhibits 2 and 3), provide more detailed insight into Esai's escalating behaviors, along with his capacity, or lack thereof, to be rehabilitated. It is a concern that the district court did not review these exhibits, nor make any reference to them whatsoever in its findings, before making its decision to transfer the cases to juvenile court. As the Nebraska Supreme Court concluded in *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018), we likewise conclude that the district court erred by not reviewing all the evidence received at the hearing before rendering a decision. See § 28-1816(3)(a) (after considering all evidence and reasons presented by both parties, case shall be transferred to juvenile court unless sound basis exists for retaining case).

However, based on the district court's statements that "our prison system" was not going to benefit Esai at 16 years old and that it was in Esai's best interests for the juvenile court to have jurisdiction over him, we also conclude that the district court's review of the additional information contained in the noted exhibits would not likely have changed the district court's decision to transfer the cases to juvenile court. The district court was focused primarily on Esai's age and his need to be removed from Nebraska and sent to the group home in Arizona. The district court's review of the exhibits would not likely have changed the decision it had already made after hearing the testimony and arguments presented at the hearing. So although it was error to not review the exhibits, we cannot say that by itself, the district court's decision to not review the exhibits constitutes reversible error. The issue really comes down to whether the district court's reasons for granting the transfer in both cases, in light of all the evidence presented, constituted an abuse of discretion.

### (c) District Court's Reasons
### for Granting Transfer

The State assigns as error that the district court did not consider or make sufficient findings pursuant to § 43-276. Once again, this same argument was made in *State v. Tyler P., supra*. In that case, and like both cases on appeal here, the district court's order merely set forth that after considering all the factors of § 43-276 and for the reasons stated in open court, the defendant's motion to transfer was sustained. "Without more, the order would not permit meaningful review by this court." *State v. Tyler P.*, 299 Neb. at 971, 911 N.W.2d at 268. However, the Nebraska Supreme Court noted that in the district court's oral findings in *State v. Tyler P., supra*, the district court said it had weighed the factors in § 43-276(1) and balanced them with the safety of the public. The district court in that case specifically referenced relevant statutory factors, "including the motivation behind the offense, the juvenile's previous criminal history, the juvenile's ability to appreciate his conduct, the best interests of the juvenile, and the safety of the public." *State v. Tyler P.*, 299 Neb. at 971, 911 N.W.2d at 269. The Nebraska Supreme Court stated that "though it would have been preferable for the district court to refer to all the statutory considerations, the statute does not require it to do so." *Id*.

In the present cases, the district court verbally stated to Esai at the close of the hearing that "in weighing all of the factors, this goes back and forth with you." It noted that it was not in Esai's best interests to be in adult court, "and if there's any chance that [Esai] could be saved, then it would not be in society's best interests that [he] be in adult court." The district court said that "the only service that could possibly help would be Canyon State" and that Esai "needs to be put out of Nebraska" and "shipped to Canyon State" to "see if there's any way they can help him save himself." When it was suggested by the State that it first be determined whether Canyon State would accept Esai, the district court stated, "I

guess if Canyon State doesn't accept him, we're probably even in more trouble, because I think just being 16 years old, I just don't think our prison system is going to benefit him at 16 years old." The district court further stated, "[I]n . . . weighing the factors, it's in the overall best interests" that the juvenile court have jurisdiction and for that court to know the district court was recommending that Esai be sent to Canyon State. The district court directed that either attorney "make sure" its recommendation was submitted to the juvenile court.

It would appear that of the 15 considerations set forth in § 43-276(1)(a) through (o), the district court found the following three factors to weigh in favor of transferring Esai's cases to juvenile court: (a) type of treatment Esai would most likely be amenable to (Canyon State rather than prison), (d) Esai's age (16), and (f) Esai's best interests. The district court did not engage in any discussion or balancing of the other considerations set forth in § 43-276(1).

[7] As stated in *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018), it would have been preferable for the district court to refer to all the statutory considerations listed in § 43-276(1); however, the statute does not require it to do so. And although the district court did not address every factor contained in § 43-276(1), it did identify the factors it deemed persuasive, namely, Esai's age, his best interests, and his possible treatment through Canyon State. Therefore, because § 43-276(1) does not require the district court to do so, we cannot say that the district court abused its discretion by failing to address every factor in the statute. See *State v. Tyler P.*, *supra*. However, the district court's failure to address certain factors does impact our analysis of whether the district court abused its discretion in transferring the cases to juvenile court given the evidence before it.

### 3. WAS TRANSFER ABUSE OF DISCRETION?

We first reiterate that it is the State's burden to prove that a sound basis exists to retain the proceedings in district court.

See *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015). The State argues that the majority of the factors set forth in § 43-276 support retaining Esai's cases in the district court:

> The extreme level of violence, the obvious public safety concerns, [Esai's] motive, his age at the time of the offense, his documented membership in a violent street gang, his lengthy history of crimes of violence involving firearms, previous adjudications in juvenile court, and [Esai's] lack of amenability to services available through the juvenile court system all support retaining this matter in adult court.

Brief for appellant in case No. A-19-1121 at 21.

### (a) Factors Favoring Retention

We agree with the State that the majority of the factors set forth in § 43-276(1)(a) through (o) favor retaining jurisdiction in the district court with regard to both cases. We count at least eight factors set forth in § 43-276(1) which favor retention, and which the district court did not specifically discuss. These factors include: § 43-276(1)(b)—the alleged offenses in both cases involved violence, including the use of firearms (in A-19-1120, victim was shot in leg causing serious injury, and in A-19-1121, law enforcement personnel and intern were subjected to unprovoked gunfire); § 43-276(1)(c)—the motivation for the crime in case No. A-19-1120 was an intentional set up to steal marijuana from the victim, and the motivation in case No. A-19-1121 was to show an aggressive stance as a gang associate by shooting at an unknown vehicle and endangering lives, not in self-defense, but based upon what was perceived as a possible threat from a rival gang despite the lack of any provocation from anyone in the vehicle; § 43-276(1)(e)—Esai's previous history includes two separate adjudications in juvenile court which show repeated problems with compliance with court orders; § 43-276(1)(g)—the consideration of public safety weighs in favor of retaining jurisdiction over Esai for a longer

period of time than the 2 years remaining in his minority (Esai will be 19 years old in April 2022), and a longer period of control and supervision appears necessary to ensure Esai's separation from gangs and firearms given the lack of progress made through the juvenile court system despite efforts in the course of Esai's two prior adjudications; § 43-276(1)(h)—Esai's ability to appreciate the nature and seriousness of his conduct is questionable (i.e., laughing about his act of criminal impersonation), and his violent tendencies appear to be escalating despite intervention measures in the juvenile court system, including Officer Braun's direct efforts to discourage Esai from his ongoing gang affiliation; § 43-276(1)(i)—Esai's best interests and the security of the public require that Esai continue in secure detention or under supervision for a period extending beyond his minority, and as argued by the State, this could be accomplished by a 5-year probation term which could include a recommendation for placement at Canyon State; § 43-276(1)(l)—Esai has acknowledged the unauthorized use or possession of a firearm on multiple occasions; and § 43-276(1)(n)—Esai is a documented gang member.

### (b) Factors Favoring Transfer

As previously noted, the district court verbally discussed the following three factors when ruling from the bench that it was granting the motion to transfer: Esai's age, his possible placement and treatment at Canyon State, and his best interests (based on adult prison not benefiting Esai given his age). And because the district court stated in its November 21, 2019, order in both cases that it had considered the criteria set forth in § 43-276, it necessarily found that these three factors were substantively weighty enough to outweigh any one or combination of the remaining factors, which the court did not discuss at all. We will first address the district court's emphasis on Esai's age, and we will then address Canyon State and Esai's best interests together.

*(i) Esai's Age*

The district court placed considerable emphasis on the fact that Esai was only 16 years old, which is understandable. However, a young age by itself does not support a transfer to the juvenile court. There have been a number of cases involving juveniles the same age or younger than Esai in which criminal proceedings were retained in the district court because other factors related to public protection outweighed the juvenile's young age, such as involvement with gangs and guns, the unlikely success of rehabilitation before the juvenile reaches the age of majority, prior juvenile adjudications, or the violent nature of the crime. See, e.g., *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018) (15-year-old defendant associated with gang charged with crimes of violence involving guns; defendant posed serious risk to community and there was no guarantee defendant would be accepted into group home given second episode of seriously violent offenses within 9-month period); *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015) (15-year-old defendant with gang involvement struck victim in face with gun and took victim's vehicle and cell phone; defendant previously adjudicated at age 13 and failed to take advantage of treatment options); *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015) (15-year-old defendant involved in same crime as in *State v. Stevens, supra*; this defendant had been in secure detention at least four times, had run away three times, had escaped from YRTC, and was previously adjudicated for two assaults and various criminal mischief violations); *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009) (14-year-old defendant fired shots which killed 6-year-old child sitting in car; defendant had history of behavior problems at home and in school, used marijuana daily and alcohol periodically, and absconded from group home; violent nature of crime, defendant's previous history of violent and aggressive behavior, and defendant's failure to respond positively to corrective treatment all supported retaining jurisdiction in district court); *State v.*

*Johnson*, 242 Neb. 924, 497 N.W.2d 28 (1993) (15-year-old defendant fatally shot man); *State v. Doyle*, 237 Neb. 944, 468 N.W.2d 594 (1991) (15-year-old defendant and coperpetrator burglarized pawn shop, took guns and ammunition, and then stole van and went to shopping mall where coperpetrator pointed loaded gun at victim in attempt to rob victim of her vehicle).

The facts present in the two cases before us do not support that Esai's age, by itself, outweighs the numerous other factors which support retention.

### (ii) Canyon State and Best Interests

It is evident the district court determined that Esai's best interests would be best served by keeping him out of the adult corrections system and instead having him placed at an out-of-state group home, Canyon State. Undoubtedly, every juvenile's best interests would be better served by attempting rehabilitation in the juvenile court system rather than being sentenced to a term of imprisonment in the adult corrections system. And to the extent the evidence demonstrates a likelihood of successful rehabilitation before the juvenile reaches the age of majority, then these factors may very well be so substantially weighted as to outweigh the numerous other considerations favoring retention for public safety concerns. The problem here, though, is that the record establishes that all rehabilitative efforts offered through the juvenile court in 2018 and 2019 cannot be characterized as nonproblematical given Esai's ongoing unlawful behaviors and his continued disregard for juvenile court orders. These failures do not support continued efforts to rehabilitate Esai in the juvenile court system, particularly given the limited time remaining to do so.

For example, exhibit 3 reveals that a secure detention placement order was entered on April 12, 2018, in one juvenile court case involving car theft because Esai violated his "conditions of liberty." Another detention order was entered in that case in July, noting Esai had been "placed on the H.O.M.E.

Program in March 2018," was detained in April for violations, and in July, cut his monitor and absconded. The July detention order also indicated that Esai "continues to use marijuana daily and says, 'He will not ever quit.'" Additionally, a capias was issued in both juvenile court cases when Esai left his grandmother's house on June 16, 2019, and his electronic monitoring device "died" at the same time. Notably, this is the same day Esai was involved in the robbery that resulted in the shooting of the victim in the leg upon Esai's directive.

The evidence also reveals that Officer Braun had met with Esai 10 to 12 times over the course of a year in an attempt to keep Esai away from gang life. And despite his efforts, Officer Braun concluded that Esai was "hard-headed" and that no matter what Officer Braun said to him, Esai "was going to do and lead the life he want[ed]." Officer Braun stated, "No matter how many times I talk to him, he hangs around with the same guys, doing the same thing, . . . he puts himself in these same situations that are very dangerous."

Additionally, when Moran was asked whether there were services within the juvenile court system from which Esai could benefit, Moran responded, "I'm not sure, to be honest." Her recommendation would be YRTC, but she was not sure Esai would benefit from that placement. Moran said that she did not think any group homes in Omaha would accept Esai given his charges and that it would be up to Canyon State whether it took him or not. While the district court did conclude that "the only service that could possibly help would be Canyon State" and that Esai "needs to be put out of Nebraska," the district court did not explain how that out-of-state group home would have any greater chance of success in rehabilitating Esai than the efforts made by the juvenile court services to date. Other than being physically separated from his current gang associations, which could be helpful, there was no evidence of how that alone would successfully rehabilitate Esai. Further, given Moran's testimony, there was no guarantee that Canyon State would accept Esai, which would

essentially leave only YRTC as an option for Esai's placement. And even Moran was not sure that any services at YRTC would benefit Esai.

Based on the evidence, the only remaining option through the juvenile court besides Canyon State would be YRTC, which is what Moran testified she would be recommending if the case was transferred. On the other hand, in support of retaining the case in district court, the State argued that if Esai was "put on probation on this case at some point," there is "nothing that says this Court couldn't send him to Canyon State." The State expressed concern about the limited amount of time left to supervise Esai under the juvenile court's jurisdiction, as well as the limited amount of services available. There was no evidence as to how either Canyon State or YRTC would be in a position to rehabilitate Esai given the limited time left under the juvenile court's jurisdiction. Further, there was no evidence of the likelihood of successful rehabilitation given Esai's history of gangs, firearms, assaults, and noncompliance with juvenile court orders.

### (c) Balancing Public Safety Against Rehabilitation of Juvenile

[8] The eight factors favoring retention outnumber the three factors referenced by the district court in making its decision to grant the motions to transfer. However, there is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Tyler P.* 299 Neb. 959, 911 N.W.2d 260 (2018). There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute. *Id*. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id*.

Accordingly, it is not a matter of the quantity of factors favoring retention or transfer. Rather, the test requires consideration of all the factors in light of the evidence presented,

followed by a balancing of (1) the factors which support retaining the case in the district court in the interests of public protection and societal security against (2) the factors which favor transferring the case to the juvenile court for the practical and nonproblematical rehabilitation of the juvenile. In other words, "This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018). "The trial court's decision carries the consequences that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id.*

These are difficult decisions, and we can only reverse a district court's decision to retain or transfer a case if we conclude it abused its discretion. See *State v. Tyler P., supra.* For sure, by count alone, there are more factors favoring retention in the cases before us. However, it is possible that those factors in total may not be weighted heavily enough to tip the scale against the fewer factors favoring transfer for the sake of rehabilitating the juvenile. If the evidence underlying the factors supporting transfer to the juvenile court is so substantial as to outweigh all other considerations, then this court could not say the district court abused its discretion by granting the transfer. However, when considering the record before us, we conclude the evidence supporting transfer was not sufficiently substantial when balanced against the considerable evidence supporting retention. There was simply no evidence to support that Esai could be successfully rehabilitated before reaching age 19; although on the other hand, there was substantial evidence that Esai's behaviors were intentional, violent, and on a path of escalation. His involvement with gangs and firearms, as well as his assaultive actions before, during, and after the present offenses, presents a serious danger to

the public. Without some evidence to demonstrate that Esai would genuinely be responsive to the remaining placement and treatment options available under the juvenile court's jurisdiction, the safety of the public is a factor warranting substantial weight.

Notably, the district court did not engage in any balancing of public safety and societal security based on the evidence presented, nor did it explain how Canyon State was a practical and nonproblematical rehabilitation option for Esai given his lack of success through juvenile court services offered to date. There was also no certainty as to whether Esai would be admitted to Canyon State, and there was no evidence as to how long Esai could be placed there and how any services there might have a greater likelihood of success in rehabilitating Esai than past efforts, particularly given Esai's escalating behaviors. Further, the district court never addressed the security of the public—it never explained why secure detention or supervision would not be necessary for a period extending beyond Esai's minority. The district court's focus on Esai's age, without also balancing the public's safety against the likelihood of Esai's successful rehabilitation under the juvenile court's jurisdiction before Esai reaches the age of majority, constitutes an abuse of discretion.

[9] When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the district court abused its discretion in refusing to transfer the case to juvenile court. See *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). Applying that same standard here, it necessarily follows that when a district court's basis for granting a transfer to the juvenile court is supported by appropriate evidence, it cannot be said that the district court abused its discretion in granting the transfer. However, in the two cases before us, the district court's reasons for granting the transfers to juvenile court were not supported by appropriate evidence, particularly because the district court did not employ the requisite balancing test by which public protection

and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. See *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015). There was no evidence to support that Esai could be successfully rehabilitated either through Canyon State, if accepted, or through YRTC in the remaining 2 years of his minority. Although there was some favorable evidence, including that Esai was likable and intelligent, there was considerably more evidence showing an aggressive, assaultive, and violent personality which was unyielding to others who cared about him and attempted to redirect him on a better path. Given the substantial evidence supporting retaining the cases in the district court for the sake of public safety and societal security, and the lack of evidence demonstrating any further rehabilitation through the juvenile system would be practical and nonproblematical in the limited time left under the juvenile court's jurisdiction, we conclude the district court abused its discretion in granting the transfer of both cases to the juvenile court.

## VI. CONCLUSION

For the reasons set forth above, we reverse the district court's orders granting Esai's motions to transfer the proceedings to the juvenile court in both cases and remand the causes for further proceedings in the district court.

Reversed and remanded for
further proceedings.