IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HORTON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

LANDON M. HORTON, APPELLANT.

Filed April 12, 2022.    No. A-21-1010.

Appeal from the District Court for Scotts Bluff County: ANDREA D. MILLER, Judge. Affirmed.

Andrew W. Snyder, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Landon M. Horton, 16 years old at the time of his alleged criminal offenses, appeals from an order of the Scotts Bluff County District Court denying his request to transfer his case to juvenile court. Finding no abuse of discretion by the district court, we affirm.

## II. BACKGROUND

### 1. INCIDENT LEADING TO CRIMINAL CHARGES

On August 28, 2021, Horton and two other individuals allegedly confronted another group of individuals outside of a residence in Scottsbluff, Nebraska. During the confrontation, Horton allegedly fired a handgun toward the other group, resulting in one of those individuals being shot in the shoulder.

In an information filed in the district court on September 22, 2021, Horton was charged with 15 counts: count 1, attempted first degree murder, a Class II felony, in violation of Neb. Rev. Stat. §§ 28-201(4)(a) and 28-303 (Reissue 2016); count 2, use of a firearm to commit a felony, a Class IC felony, in violation of Neb. Rev. Stat. § 28-1205(1)(c) (Reissue 2016); counts 3 through 7, terroristic threats, each a Class IIIA felony, in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 2016); count 8, carrying a concealed weapon, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-1202 (Supp. 2021); count 9, first degree assault, a Class II felony, in violation of Neb. Rev. Stat. § 28-308 (Reissue 2016); count 10, unlawful possession of a handgun, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-1204 (Reissue 2016); counts 11 and 12, use of a firearm to commit a felony, each a Class IC felony, in violation of § 28-1205(1)(c); and counts 13 through 15, terroristic threats, each a Class IIIA felony, in violation of § 28-311.01.

On October 6, 2021, Horton filed a motion to transfer his case to juvenile court.

2. HEARING ON MOTION TO TRANSFER

A hearing took place on November 12, 2021. The State and Horton each called 2 witnesses. Several exhibits were also received into evidence. We summarize the evidence as follows.

(a) State's Evidence

*(i) Testimony of Investigator Brandi Brunz*

Investigator Brandi Brunz, City of Scottsbluff Police Department, testified that on August 28, 2021, she was called to a residence in Scottsbluff after a report of a shooting. According to Investigator Brunz, the owners of the home said

> [t]hey were doing some home repairs on the outside of their home when they had noticed there were several kids outside hanging around at their house while they were working on their home.
>
> A red SUV drove by. There was some hollering amongst the occupants of the SUV and the kids in the yard. And then about ten minutes later, the three individuals approached their house from the east, and a verbal altercation ensued between the three individuals who walked up and the group of people in the yard.

The owners of the home were able to identify two of the individuals who had walked up as Ray Camacho, 18 years old, and Gabriel B., 17 years old, but the homeowners did not know the third individual. Another witness, Jacob E., 18 years old, recognized Camacho as the "front drive passenger" of the SUV; Jacob later identified Horton as the third individual who had walked up to the residence. Footage of the incident was captured on surveillance video from the home. Investigator Brunz stated that exhibit 1 contained "three different angles of the camera footage from the [homeowners'] surveillance video"; exhibit 1 was received into evidence.

Investigator Brunz explained what was happening in the video footage as it was played at the hearing. She identified the individuals in the video, including Horton, Camacho, Gabriel, Jacob, Dimitri E., Ramon E., and three others. She explained that Horton and Gabriel both "pulled firearms from their pants[.]" Most of the time Gabriel had his gun out and pointed at the people in the yard. At one point in the video, Horton "racks back the slide on [his] firearm," "loading a round into the chamber." There was a muzzle flash from a shot; Investigator Brunz did not say which

gun this shot game from. Then there was "another muzzle flash from a shot being fired" from Horton's gun. When asked if during the course of her investigation she was able to determine whether anyone was actually shot, Investigator Brunz responded, "Yes. Jacob E[.] was shot in the left shoulder." Jacob was taken to the hospital, and he was released the following day after outpatient surgery. Jacob told Investigator Brunz that the first shot fired missed him, but the second shot impacted his shoulder. When asked if "from the video, the second shot came from Mr. Horton," Investigator Brunz responded, "Correct."

As part of her investigation, Investigator Brunz collected samples to test for gunshot residue. The Nebraska State Patrol Crime Lab report with the results of the gunshot residue tests was received into evidence. According to the report, "primer gunshot residue kit[s]" were collected from Horton, Camacho, and Gabriel. "Two particles characteristic of primer gunshot residue were detected" in Horton's kit, and "[o]ne particle characteristic of primer gunshot residue was detected" in Gabriel's kit. "The presence of primer gunshot residue on a subject's hands indicates the subject discharged a firearm, handled an object with gunshot residue on it, or was in close proximity to a firearm when it was discharged." (Emphasis omitted.) The kit collected from Camacho was not analyzed as it was collected too many hours after the shooting for any meaningful conclusion to be obtained.

Investigator Brunz was asked about a possible motive. She said: "There had been ongoing confrontation between the two groups. There's an assault and robbery charge or a report taken by Gering Police Department and also followed up on by Scottsbluff Police Department between the dates of June 5 and actually spanned through June 7[, 2021]."

The Scottsbluff Police Department report was received into evidence over Horton's relevance and hearsay objections. According to the report written by Officer Joshua Hansen:

On Saturday, June 5, 2021[,] at approximately 23:15 hours, Dispatch advised that Gering Police Department was requesting Scottsbluff officers to check [a specific address] for Gabriel B[.] . . . I asked Dispatch what type of call the request was in reference to and was advised it was for an assault. . . . I went with Ofc. Griess to the above address. . . . Ofc. Griess went to the front door and had contact with Janet M[.] and her grandson Gabriel.

. . . .

A short time later Gering Police Department Officer Steve Schneider arrived and spoke with Gabriel about an assault and possible robbery that occurred in Gering. During this conversation it was learned that the identified suspect in that robbery, Landon Horton, was present at the residence as well. Gabriel went inside and came back out with [Horton] to speak with Ofc. Schneider further about the incident. I observed [Horton] had injuries on his face consistent with being in a fight.

At first [Horton] denied knowing anything about the incident, but later admitted he had discovered his girlfriend was cheating on him, and he beat up the person she was hanging out with tonight. [Horton] was adamant that he was alone when this happened despite Ofc. Schneider advising him a witness who was not involved had reported seeing [Horton] and two other males "jump" the person, beat him up, and take his shoes. Gabriel also stated he was not with [Horton] earlier and had been at home all day.

I advised Gabriel and [Horton] that now that this was an active police investigation that everyone involved could be considered witnesses. I advised them against further

- 3 -

assaults, or anything that could be seen as attempts to intimidate someone else involved even if it was by proxy. . . . Officers then left the area and I continued regular patrol.

At approximately 0300 hours on June 6, 2021[,] Dispatch advised Janet was calling because there was a large physical altercation in her yard. While officers were responding[,] Dispatch advised Janet was reporting the other half of the altercation had left in unknown vehicles and headed west and north from her residence. I arrived and spoke with Janet, [Horton], and Gabriel briefly. I observed [Horton's] face was in even worse shape than it was last time we were at the residence. I observed he had scrapes on his arms like he had been on the ground as well.

All three people started telling me what happened and stated a vehicle had pulled up and someone in the vehicle threw a large rock at [Horton's] vehicle and then left. They stated the vehicle came back a bit later and that there was two more vehicles in [sic] it and all 3 vehicles were full of people who came onto the property and started trying to fight them. . . .

. . . .

. . . . [Horton] stated that somewhere between 14 and 18 people got out of the cars and started walking onto the property. He stated he observed his ex-girlfriend's father and sister was with them. I asked him what their names are and he stated he did not know. . . .

. . . . He stated that his girlfriend's dad then started asking each of the boys "Are you [Horton]?" and when he discovered which one was [Horton] he lunged at him like he was going to attack him but was held back with some of the younger males that were there. [Horton] stated that it was becoming obvious that if he did not fight one of the males one-on-one that they were all going to "jump" him. He stated he agreed to fight one of the male subjects one-on-one. He stated they started to square up to fight, and one of the other unknown males hit him in the face from the side. He stated then 3 or 4 males started hitting him and kicking him while he was on the ground. He stated he did not know the names of anyone who hit him or the names of anyone that showed up. . . .

. . . .

Gabriel stated that some of the males had baseball bats and one had a knife. Gabriel stated because of this he went in his house and got a kitchen knife. He stated when he came back out that he was swinging the knife around wildly trying to ward off 3 or 4 people who were trying to attack him. Gabriel stated this melee continued until Janet woke up and came outside and yelled that she was calling the police and then all the males left in their vehicles before we arrived.

. . . .

I asked [a named witness] if he knew anyone that was there and he stated he did. [The witness] stated that he and his brothers used to be related by marriage to Jacob E[.], Dimitri E[.], and their little brother (most likely Ramon). He stated all three of them were there . . . .

. . . .

I advised [Horton's mother] and [Horton] there was not [sic] a Gering police department investigation as well as a Scottsbluff Police Department investigation for the two related incidents. . . .

A short time after I left the residence, Dispatch advised that [Horton's mother] had called and asked to speak with me. [Horton's mother] stated that when they returned home from picking [Horton] up, they had observed their windows were broken out and screens cut on their home. . . . I advised her that her home is in the Scotts Bluff Sheriff's Office jurisdiction. I advised her I would call in her complaint for her and a deputy would come to their home. . . .

On Sunday June 7, 2021[,] at approximately 2100 hours, I received a phone call from [Horton's mother]. . . . She stated that someone (she did not know who) received a SnapChat message from an unknown person saying that the subjects from the previous night were going to go try to attack them again at Janet's house. . . .

. . . . Before I could respond to the residence, Janet called the Communications Center via 911 and reported that there was two vehicles at her house and the people in them were attempting to create another disturbance. . . . As officers were responding to the area, Dispatch advised that Janet was reporting the vehicles left the area. I arrived and spoke with Janet, [the same named witness as earlier], and an unknown male. . . .

[The witness] stated he received a message from Gabriel which contained a screenshot of a SnapChat message from Jacob E[.] to Gabriel. [The witness] stated he took the message to mean that they were going to come back to the house again. . . . [A] short time later, the . . . E[.] brothers showed up in a red Ford pickup . . . . [with another] vehicle . . . that he did not recognize. [The witness] stated that the group got out of their vehicles and threw a bottle at the house. He stated he picked the bottle up and walked out to their vehicles and told them they needed to leave, that [Horton] and Gabriel were not even at the house. [The witness] stated that they then got in their vehicles and left.

. . . .

. . . . Still under investigation.

According to Investigator Brunz, the assault on the person who was dating Horton's girlfriend occurred on June 5, 2021. The June 6 altercation at Gabriel's house was a result of what happened on June 5. According to her testimony, the assault and robbery case was still pending in Scotts Bluff County.

On cross-examination, Investigator Brunz confirmed that according to the police report, Horton was "jumped" by multiple individuals on June 6, 2021; Investigator Brunz did not know who actually struck Horton, but confirmed that Jacob, Dimitri, and Ramon were involved; these same individuals appeared in the video from August 28. She also confirmed that in the video from August 28, Jacob pulled up his shirt as the other young men approached; "Jacob displayed that he was ready for a fight." She also confirmed that (at some point) in the video, Jacob picked up a rifle from the front yard and pointed it in the general direction of Horton, Camacho, and Gabriel; Investigator Brunz subsequently learned that it was an AirSoft rifle, but she could not tell that from the video.

On redirect, Investigator Brunz confirmed that on August 28, 2021, Jacob, Dimitri, and Ramon were guests at the residence where the incident occurred; they had been "working on a car, and they had been previously shooting the AirSoft rifles throughout the day." She then confirmed

that the SUV drove by, Camacho was identified, words were exchanged, and then 10 minutes later Horton, Camacho, and Gabriel came back with handguns.

*(ii) Testimony of Dylan Bairn*

Dylan Bairn, a juvenile probation officer, testified that at around 12:20 a.m. on August 29, 2021, he received a call from the Scottsbluff Police Department to conduct an intake on Horton and another juvenile in custody at that time. Bairn explained that

[a]n intake is requested by law enforcement due to a statute in the State of Nebraska that in order for a juvenile to be placed into a detention facility[,] an officer, juvenile probation officer, has to conduct a risk assessment instrument or a screening to determine the appropriate level of care, and that's based on many different circumstances.

. . . .

A big portion of that is the interview with both the parents and the juvenile. You interview the law enforcement officer on that, look at any prior legal involvements, any pending cases with the courts, failures to appears, and some other just background that they have like school, substance use, those types of things.

Bairn learned that Horton had a pending juvenile case for first degree assault and robbery. During Horton's 40-minute interview, during which his mother was present, Bairn learned: Horton was home-schooled and on track to graduate in May of 2023; both Horton and Gabriel worked for Horton's mother who owned a painting business; and Horton used marijuana three to four times a week to self-medicate his diagnosed anxiety, but he was also taking prescribed medication for his anxiety. Bairn stated that after his intake was completed, the county attorney charged Horton as an adult, but Horton "would have scored for secured detention if it would have been filed as juvenile" because it was determined that he needed to be in custody.

Bairn "never supervised" Gabriel, but "[k]new he had been on juvenile probation previously with another probation officer about six to eight months prior" to the incident on August 28, 2021. Bairn knew "Camacho had been pretty involved in juvenile probation over the previous three and a half years with various charges and various placements," but Bairn never supervised him.

Bairn was asked about some of the factors contained in Neb. Rev. Stat. § 43-276(1) (Cum. Supp. 2020) that are to be considered in determining whether to maintain jurisdiction in adult court or juvenile court. The questions and answers were as follow.

Q. [(by the State)] And specifically, Subsection A talks about the type of treatment the juvenile would most likely be amenable to. What can you tell us about that in regards to Mr. Horton?

A. In regards to Mr. Horton, kind of an interesting place because he hadn't had any prior legal involvement. I didn't know a whole lot about him. It was pretty hard to almost make a complete determination from that. But up to that, I mean, outside of the self-report of the anxiety and medications, I really didn't have a whole lot to go off of from that.

Q. So what would be available to him in juvenile court?

A. Quite an array of services are available to the juvenile, and a lot of times that's based on something such as psychological evaluation to determine what services are

available to the youth. I mean, there's ranges from community-based services up to your private residential treatment levels of care, and then your highest level of care of juvenile probation would be YRTC.

Q. And based on the severity of the offense here, do you know in juvenile court what he would be most amenable to, or would you need a psychological evaluation?

A. I believe that a psychological evaluation would give us a lot of insight to make a more solid determination for making recommendations for him. But, again, based on the severity of the circumstances here, you would be looking at one of those higher levels of care.

Q. Which would include YRTC; is that right?

A. Yes, that's correct.

(Emphasis omitted.) Under § 43-276(1)(b), whether there was evidence that the alleged offense included violence, Bairn agreed that it did include violence. When asked about § 43-276(1)(c), the motivation for the commission of the offense, Bairn stated that during his interview with Horton he "really stayed away from the circumstances of the offense that night and just focused on the background dynamics for the probation interview to get completed [sic] of the risk assessment instrument." When asked about "[p]revious history," presumably in reference to § 43-276(e), Bairn confirmed his earlier testimony that Horton had a pending juvenile case for assault and robbery. The State asked Bairn how § 43-276(1)(g), consideration of public safety, figured into his testimony or opinion. Bairn responded:

Again, part of the interview process with law enforcement, that's one of the biggest parts of my job is making sure that the public is safe from individuals. And so with the allegations in the incident that evening, there was a high level of public safety. Guns were involved in this incident, and so there was an extreme high regard for public safety.

He was then asked:

Q. [(by the State)] What about -- one of the factors[, § 43-276(1)(i),] talks about the security of the public and the fact that detention or treatment may be needed beyond the period of majority [sic].

What can you tell us about that in regards to this particular offense and this defendant who turned 17 about a month ago?

A. Again, a very tricky part of juvenile court is always thinking forward on that. You only have until the age of 19 to make any of those types of recommendations before your time essentially expires. And so if you were to go to YRTC and take -- and not receive or get all of his rehabilitation in that amount of time, regardless of what happens once he turns 19, you essentially run out of time in juvenile court.

(Emphasis omitted.) Regarding § 43-276(1)(l), whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm, Bairn agreed that as seen in the video, Horton shot the gun; Bairn also agreed that at 16 years old Horton could not legally possess a firearm. When asked if Horton seemed to understand the gravity and seriousness of the offense, presumably in reference to § 43-276(h), Bairn replied, "Yes."

On cross-examination, Bairn stated that he did not know that Dr. Gage Stermensky performed an evaluation of Horton on January 4, 2021, but he acknowledged that would typically be something that he would consider in making recommendations to the juvenile court. Dr. Stermensky's report was received into evidence without objection.

According to Dr. Stermensky's report, he evaluated Horton on January 4, 2021, because Horton's mother "reported he was 'pulled over and arrested for possession and paraphernalia,'" and she "reported this as a second offense"; "Per the client he was first cited sometime in November." Horton was "currently on diversion." Dr. Stermensky's diagnostic impressions were that Horton had "[c]annabis use disorder, moderate," and "[g]eneralized anxiety disorder." The section of the report labeled "ASAM Multidimensional Assessment," notes that Horton presented with symptoms consistent with generalized anxiety disorder and would benefit from continued symptom monitoring, was unable to maintain abstinence or significantly reduce use with only minimal support, and others are supportive but require professional interventions to improve Horton's chance of treatment success and recovery. Dr. Stermensky's recommendations included "Lv5 intervention: Intervention/education services," such as "Co-Occurring Group," family therapy, supervised classes, continued evaluation, and relapse prevention and refusal skills; random drug testing; individual therapy; and exploration of tobacco cessation strategies.

Defense counsel then asked Bairn about parts of Dr. Stermensky's report, specifically that: Horton would benefit from continued symptom monitoring; Horton was unable to maintain abstinence or significantly reduce use of substances with only minimum support; Horton might require professional intervention (e.g. group therapy, family therapy, supervised classes, and continued evaluation) to improve his chances of success and recovery; Horton would need random drug testing; and Horton would benefit from individual therapy. Bairn confirmed that the above could be provided or monitored in the juvenile system.

Bairn also acknowledged that he did not have the benefit of seeing a report by Juanita Rodriguez, a certified drug and alcohol counselor. Rodriguez' report was received into evidence without objection. According to Rodriguez' report, Horton was seen on November 2, 2021, at the Scotts Bluff County Detention Center for a substance abuse evaluation after being referred by his mother. The report states that Horton was under the influence of marijuana and methamphetamine at the time of the August 28 incident. Rodriguez diagnosed Horton with "[m]ethamphetamine use disorder, moderate," "[c]annabis use disorder, moderate," and "[a]lcohol use disorder, moderate." Under "Primary/Ideal Level of Care Recommendations," Rodriguez stated:

> Client is willing to do treatment. He thinks he would like to go to residential treatment then to Job Corps. He has only seen his primary care provider who prescribed medication for his anxiety. He has never had mental health therapy or treatment. He needs a current mental health assessment to assess his anxiety and anger issues. Should client be considered for probation, Teen Challenge would be a viable option to address his needs as it is a long-term program and is in line with his current spiritual practices.

Bairn was asked if he was familiar with Teen Challenge, a residential treatment option that Rodriguez suggested may be appropriate for Horton. Bairn testified that he was familiar with a "few different" programs similar to Teen Challenge. He said:

[D]epending on the program, you know, I know one semi locally [sic] that isn't often a recommendation of juvenile probation. They're often services that we've used or had when parents have come to us in juvenile probation asking for types of services, and often this is somewhere that we can divert those parents to youth [sic] before they come to probation. It's not one that we can actually recommend in juvenile probation.

When asked what types of services these programs provide, Bairn responded, "They often provide structure, stability, addressing the mental health aspects, along with providing in-house school, [and] home conditions."

(b) Defense's Evidence

*(i) Testimony of Juanita Rodriguez*

Rodriguez, a certified drug and alcohol counselor, testified that she evaluated Horton at the detention center at his mother's request. Rodriguez' report was previously received into evidence. After completing her evaluation, Rodriguez believed that a residential treatment program would benefit Horton "[d]ue to the serious nature of what he's involved in, his history of substance use and his associates, and the need for some structure." Rodriguez was then asked if she had any specific recommendations about a residential program, and the questions and answers were as follows.

Q. [(by Horton's counsel)] Did you have any specific recommendations about a residential program?

A. We talked about Teen Challenge. While incarcerated [Horton] has developed a spiritual program, and his mother also has a strong spiritual program. It's based on a spiritual program that's highly structured and it's long-term, from 12 to 18 months.

Q. Is Teen Challenge the specific program you're thinking of, or is this just a more generalized thing that can be done at various locations or places?

A. There's various programs. As I looked into Teen Challenge, the closest program that would accept someone with his needs -- because they have you select criteria, and one of the criteria that was selected was that he was 17 and the possibly [sic] of probation -- and Lawrence, Kansas[,] was the closest program available.

. . . .

Q. . . . You heard Mr. Bairn testify. You were in the courtroom?

A. Yes.

Q. And based on his testimony, would you agree with him that the types of services that these places might provide can be replicated or provided through the juvenile system?

A. Yes.

(Emphasis omitted.)

On cross-examination, Rodriguez was asked if there would be aftercare following residential treatment. She said she believed that Teen Challenge did have "some independent living opportunities for people when they are finished," but she "did not look into that more specifically." When asked if they would still have that available after the person turned 19 or reached the age of majority, Rodriguez replied, "I believe that they would. It's a program that has long-term

commitment to individuals that they work with." According to Rodriguez' report, Horton identified that he struggled with anger issues that had gone unaddressed. Rodriguez testified that there was a need to address those issues and believed "that through any of the programs they have the ability to address both mental health and substance abuse, and that would fall under the mental health." She also testified that "further assessment" was needed to determine if Horton might need treatment beyond the age of majority.

*(ii) Testimony of Horton's Mother*

Horton's mother testified that Horton had struggled with anxiety issues "[h]is whole life" and there were times when he saw a therapist or had been on medication. Their family moved from Wyoming to the Scottsbluff area in September 2019. Beginning in elementary school, Horton went back-and-forth between homeschooling and public school every 1 or 2 years; he had been in public school since 7th grade, and had completed his 9th and 10th grade years in Scottsbluff. In Scottsbluff, Horton initially did well in school, but "[i]t slowly started to change, especially in tenth grade. He started to fall off." Horton's parents were concerned about drug activity. "[R]ight before Dr. Stermensky's report," Horton had been pulled over for speeding and had possession of paraphernalia that resulted in Horton's participation in and successful completion of diversion through the Scotts Bluff County Attorney Office. A letter from the Scotts Bluff County Attorney to Horton dated July 12, 2021, which was received into evidence, stated that Horton had successfully completed his diversion program and the charges against him had been dismissed. Horton's mother said that in the last semester of 10th grade, Horton's grades dropped "[v]ery significantly," to the point where his GPA that semester was "like .7," but the school "passed him." Horton's mother continued to have concerns about drug use, "[b]ut we looked, we talked, we searched cars, we searched houses, and nothing." The family decided to homeschool again during the 2021-22 school year, and Horton had done "a couple weeks" prior to August 28, 2021.

Horton's mother did not believe that he had ever been a member of a gang. When asked to describe Horton's maturity level, she said, "He thinks he's mature, and in some ways he is, but some of his decision-making definitely lacks a mature level of action, level of choice." When asked if she had concerns about Horton being in the adult system, she replied, "Absolutely." She was asked what her concerns were and she responded, "He's a child. He is nowhere near adult. He doesn't think like an adult. He doesn't act like an adult. He's small, he's cute, and he would be very vulnerable there. I would be terrified."

On cross-examination, Horton's mother stated that "until recently" she was not aware that Horton had used any other drugs besides marijuana. However, she learned from Rodriguez' report that Horton used methamphetamine. Until the alleged assault in June 2021, she never had any issues with Horton regarding violence, and there was nothing to indicate that he was violent. When asked who Horton was associating with, his mother stated that she was only aware that he was associating with "Gabe" and she "[did not] remember the other boy's name because he didn't come to the house." She said she had met Camacho once and had "heard stories about him"; Horton was "forbidden from being around him." Horton's mother believed that he understood the severity of the charges and said that he had been taught the difference between right and wrong.

- 10 -

### 3. District Court's Journal Entry

The district court entered its order on December 10, 2021, finding the State met its burden to show a sound basis for retaining jurisdiction in the district court and denying the motion to transfer. After detailing its findings under the § 43-276 factors, the court concluded:

> Due to the nature of the alleged criminal conduct, societal security weighs heavily in favor of retention in district court and against the practical and nonproblematical rehabilitation of the juvenile, especially considering the treatment options available and time to secure those options for the juvenile. [Horton] shot a firearm at a group of individuals resulting in one individual being shot. His behavior has significantly escalated posing a risk to the community.

The details of the district court's consideration of the transfer factors contained in § 43-276 will be provided in our analysis below.

## III. ASSIGNMENT OF ERROR

Horton claims the district court abused its discretion when it denied his motion to transfer to juvenile court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. Jurisdiction

When a juvenile seeks to transfer a criminal case from adult court to juvenile court, Neb. Rev. Stat. § 29-1816(3)(c) (Supp. 2021) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal." The statute further states that, upon entry of such an order, "any party may appeal to the Court of Appeals within ten days." On December 10, 2021, the district court entered a journal entry denying Horton's motion to transfer his case to juvenile court, and Horton filed his notice of appeal on December 16; his appeal is timely.

### 2. Legal Framework

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, the allegations against Horton put him within this category of juvenile offenders, and the State filed the charges against Horton in the district court.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3). In the instant case, when Horton moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court[.]" See § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

3. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

Horton contends the district court "erred in admittedly placing more weight on the factors involving public security over the other factors to be considered by the court." Brief for appellant at 8. He argues that the court "failed to give due weight and consideration to [his] best interests, the treatment he requires and [the] key role rehabilitation plays for juveniles." *Id.* at 12. He further argues that the court made decisions not supported by the record. For example, the court found

that Horton had a history of criminal behavior, when "the only conclusive history was [his] citation for speeding and possession of marijuana" for which he successfully completed diversion. *Id.* at 13. Horton acknowledged that he had pending allegations in juvenile court, but argued that for the court to "assume the outcome of that case deprived [him] of a substantial right, the right to have to be proven guilty or subject to the juvenile code." *Id*. He also argued that the court "unfairly placed the burden upon [him]" to show that he could complete recommended services within his age of minority; but "it was the State's burden to show [he] would need services beyond the age of majority and it failed to do so." *Id.*

The State contends that the district court carefully considered the evidence in light of the § 43-276 factors and that its decision to retain jurisdiction was supported by appropriate evidence. The State asserts that "Horton's continued drug use, coupled with the sudden increase in the frequency and severity of his criminal conduct, is deeply troubling and, given his age and the time constraints inherent in the juvenile court's jurisdiction, militate against transferring his case to juvenile court." Brief for appellee at 10.

(a) Factors Favoring Retention

The district court addressed each of the factors contained in § 43-276(1), but it did not specifically identify which factors favored retention in the district court. Nevertheless, we can surmise such from the context of the court's analysis of each factor. The district court appears to have found the following factors favored retention in the district court.

Under § 43-276(1)(a), the district court found:

It is unclear whether [Horton] would be amenable to the treatment or services in the juvenile court. The evidence does show that with pending juvenile charges he engaged in additional criminal conduct resulting in the pending criminal case. Additionally[,] while on diversion he was told to stay away from . . . Camacho which he apparently ignored as . . . Camacho was present and participated in the events of August 28, 2021. He received an evaluation from Dr. Stermensky and declined to follow the recommendations to cease use of illegal substances by his own admission during the evaluation with Ms. Rodriguez.

Under § 43-276(1)(b) and (c), the district court stated, "[t]he acts of [Horton] as alleged are violent, premedi[t]ated and aggressive in nature," and the motivation "appears to be ongoing confrontation and retaliation [of a prior assault] between two groups of boys." Under § 43-276(1)(d), Horton "was 16 at the time of the offense and has since turned 17," the "ages of the remaining participants are between 16 and 18 years of age at the time of the incident," and two of the participants were known to Mr. Bairn as being involved in the court system and on probation." Under § 43-276(1)(e), in considering Horton's history, including whether he had been convicted of any previous offenses or adjudicated in juvenile court, the district court found: Horton had a history of criminal behavior including a prior marijuana case for which he received diversion, and a pending juvenile case for assault and robbery; he was involved in a violent situation in June 2021 involving the same two groups of boys; his mother testified that he was exhibiting antisocial behaviors; and he was "using drugs excessively as indicated in his substance abuse evaluation with Mr. [sic] Rodriguez."

- 13 -

When considering public safety (§ 43-276(1)(g)), the district court stated it considered the safety of the public "as a heavily weighted factor"; the "allegations are such that a gun was fired in broad daylight into a residential area in retaliation," and "[a] young man was shot as a result of the situation"; and Horton's "behaviors have escalated quickly in a short amount of time and have been largely undeterred in the juvenile system." Regarding Horton's ability to appreciate the nature and seriousness of his conduct (§ 43-276(1)(h)), the district court found the evidence showed that Horton was entering 11th grade and was a "bright and knowledgeable individual"; "Mr. Bairn testified [Horton] understood the gravity and seriousness of the offenses during his interview"; and Horton's mother testified that he understood the severity of charges and knew the difference between right and wrong.

When considering whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and the best alternatives suited to this purpose (§ 43-276(1)(i)), the district court found "[t]here was no evidence presented that would indicate with any certainty that [Horton] will not need treatment beyond his minority." The court stated:

> The evidence shows [Horton] has a severe drug problem which has significantly escalated in the months prior to this event. Despite the evaluation and recommendations of Dr. Stermenski [sic] combined with involvement in the juvenile courts, [Horton's] behaviors have continued to escalate and remain undeterred. The Court views this factor as significant. The seriousness of this offense and [Horton's] escalating level of violence would warrant extensive supervision over a period of years. The Juvenile Court would have less than 2 years to work with [Horton] after a transfer to Juvenile Court and an adjudication.

Regarding whether there was a juvenile pretrial diversion program established (§ 43-276(1)(k)), the district court stated there was evidence that Horton "had participated [in] and completed juvenile diversion in May 2021." Under § 43-276(1)(l), the district court found that Horton "had a firearm and used it in the commission of this offense, however he has no prior conviction for firearms." Under § 43-276(1)(n), the district court found that "[b]ased on the evidence presented it is likely that [Horton] is engaging in behaviors consistent with gang activity"; "[a]lthough no specific gang affiliation is shown for [Horton] his actions and behaviors are consistent with juveniles who are affiliated with gang members."

### (b) Factor Favoring Transfer

The district court did not specifically state which factors favored transferring the case to the juvenile court, but as noted previously, we can surmise such from the context of the court's analysis of each factor. Under § 43-276(1)(m), the district court found no juvenile court order had been issued pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016) (related to juvenile court disposition and prior finding that juvenile is not amenable to rehabilitative services provided under Nebraska Juvenile Code). The nonexistence of such an order would support a request to transfer.

### (c) Neutral Factors

Under § 43-276(1)(f), regarding the best interests of the juvenile, the district court stated, "The evidence shows that [Horton's] witnesses testified it would be in his best interest [to] receive treatment however there is no determination regarding the length or efficacy of that treatment program, particularly whether it would extend beyond the age of majority." Under § 43-276(1)(j), regarding whether the victim agreed to participate in restorative justice, the district court stated that "[m]ediation" was "[n]ot considered." (Emphasis omitted.) Finally, the court found there were no other matters to consider under § 43-276(1)(o).

### (d) No Abuse of Discretion

The district court's analysis of the factors under § 43-276(1) reveals only one factor favoring transfer to the juvenile court. However, there is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute. *Id.* It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.* "This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018). "The trial court's decision carries the consequences that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id.*

As we often state in our review of juvenile transfer cases, these are difficult decisions for the trial court and for this court on appeal because of the young age of the defendants. However, a young age by itself does not support a transfer to the juvenile court. See *State v. Esai P., supra* (setting forth cases of defendants as young as 14 or 15 years of age in which criminal proceedings were retained in district court because factors favoring public protection outweighed juvenile's young age, such as involvement with gangs and guns, violent nature of crime, or unlikely success of rehabilitation before juvenile reaches age of majority).

In this case, the district court was properly concerned about the nature of the alleged criminal conduct, the safety of the public, and Horton's need for extensive supervision over a period of years and the limited time available to the juvenile court to work with him. The court also expressed concern that Horton's behavior had "significantly escalated." The escalation had occurred despite Horton's previous involvement in the juvenile court and despite Dr. Stermensky's evaluation and recommendations for Horton. Even with those interventions, Horton's behaviors "continued to escalate and remain undeterred." The court viewed "this factor as significant."

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Leroux, supra*. Given the evidence in this case, we cannot say the district court abused its discretion in declining to transfer the case to juvenile court.

## VI. CONCLUSION

Finding no abuse of discretion by the district court in its decision to retain jurisdiction over Horton, we affirm the December 10, 2021, order denying Horton's motion to transfer the proceedings to juvenile court.

AFFIRMED.