IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HERNANDEZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTIAN X. HERNANDEZ, APPELLANT.

Filed March 21, 2023.    No. A-22-803.

Appeal from the District Court for Douglas County: JEFFREY J. LUX, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Abbi R. Romshek for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

PIRTLE, Chief Judge, and ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Christian X. Hernandez appeals the order of the Douglas County District Court denying his motion to transfer his case to the juvenile court. Finding no abuse of discretion by the district court, we affirm.

## II. STATEMENT OF FACTS

### 1. FACTS LEADING TO CHARGES

A few days before Christmas on December 22, 2021, Hernandez was a rear seat passenger in a vehicle driven by Samuel Lopez. After individuals in a blue car honked at Lopez' car, Lopez followed and eventually pulled up beside the blue car when Hernandez allegedly fired ten gunshots toward the occupied vehicle striking backseat passenger 14-year-old Isabella Santiago. Santiago died from her injuries. Hernandez, who was 16 years old at the time of the offenses, was charged with first degree murder, a Class IA felony; discharging a firearm at an inhabited house, occupied

- 1 -

building, or occupied motor vehicle, a Class ID felony; and two counts of use of a firearm to commit a felony, both Class IC felonies.

## 2. MOTION TO TRANSFER

In March 2022, Hernandez filed a motion to transfer his case to juvenile court. A hearing on Hernandez' motion to transfer was held over two days in September and October.

### (a) Evidence Adduced by State

During the hearing, the State offered, and the court received, 19 exhibits into evidence including police reports and other documents related to the current case, police reports pertaining to Hernandez' involvement in a December 2018 burglary, police reports regarding Hernandez being a missing juvenile in July 2021, police reports pertaining to Hernandez' Sarpy County third degree assault charges in August 2021, reports of a fight that Hernandez engaged in while in custody in the Douglas County Youth Center (DCYC), transcripts of the preliminary hearings of Hernandez and his co-defendant regarding the current offenses, videos of witness interviews conducted during the investigation into the current offenses, juvenile intake summaries, and photographs. The court also agreed to the State's request to take judicial notice of the current case file.

### (b) Evidence Adduced by Hernandez

In support of Hernandez' motion to transfer to juvenile court, the defense adduced testimony from Dr. Kari R. Perez, a clinical and forensic psychologist. The defense also offered into evidence, and the court received, exhibits including a letter authored by Michael Menendez, a provisionally licensed mental health practitioner who had been providing treatment to Hernandez; an affidavit from Melissa Driscoll, the juvenile court coordinator for the Douglas County Public Defender's Office; information regarding the programs and services provided by Nebraska Correctional Youth Facility Programs; and a screenshot of a database showing that Hernandez had no gang affiliation.

### (i) Dr. Perez

Dr. Perez testified that she was hired by the defense to examine Hernandez to determine characteristics that would make him appropriate or inappropriate for transfer to juvenile court. Dr. Perez' examination culminated in a "Juvenile Reverse Waiver Evaluation" which was received into evidence as exhibit 21.

### a. Method of Evaluation and Background

In conducting her examination, Perez met with Hernandez on two occasions for a total of 3½ hours, interviewed Hernandez' mother and brother, and reviewed other materials including Omaha and Bellevue police reports, DCYC investigative reports, school records including behavioral reports, Hernandez' mental health counseling notes from DCYC, photographs, and interviews of suspects and witnesses. Perez testified that Hernandez' childhood environment was "not a very good situation" which included money issues, domestic violence between Hernandez' mother and father, a poor housing situation where the electricity and water was intermittently shut off, and a lack of food and resources. In elementary school, Hernandez was "above level in all

subject areas" and was described by teachers as "polite." Hernandez' grades began to drop in middle school due to Hernandez' failure to apply himself. He became disruptive, began to exhibit defiance towards teachers, and displayed aggressiveness toward peers. During his school career, Hernandez received approximately five suspensions and was ultimately expelled at the beginning of 11th grade for fighting. As a result of the fight, Hernandez was also charged with third degree assault for which he was placed on juvenile diversion. Perez also noted that, since being placed at DCYC, Hernandez has had behavioral issues including fighting.

Perez also noted that Hernandez denied gang involvement but was affiliated with a group that called themselves the "GMS" or "Get Money Squad" which she stated "seem[ed] to be more of a group that is . . . engaging in delinquent activities." Perez explained that Hernandez' criminal history included a burglary when he was 13 years old for which he was placed on diversion and successfully completed. Thereafter, Hernandez was reported as a missing juvenile, was charged with careless driving, and was charged with third degree assault for a fight at school which resulted in his expulsion.

b. Psychological Assessments

Dr. Perez performed three psychological assessments of Hernandez: the Minnesota Multiphasic Personality Inventory Second-Adolescent-Revised Format (MMPI-A-RF), the Millon Multiaxial Adolescent Clinical Inventory II (Millon), and the Conners 3 Self-Report Form (Conners 3).

The MMPI-A-RF was administered to provide information about response style (over-reporting, underreporting, inconsistent reporting, fixed responding), clinical symptoms, and personality traits and characteristics. Dr. Perez stated that results of the MMPI-A-RF were unreliable because Hernandez was significantly underreporting even minor shortcomings.

The Millon is designed to identify psychological problems in children including emerging personality styles and clinical syndromes and assist in detection of early signs of mental disorders. According to Dr. Perez, the Millon assessment

> was useful in the sense that it had some information about [Hernandez'] needs to be independent and autonomous and . . . his conflict between wanting his . . . mother or his brother or people in his life to think highly of him and to be industrious and meticulous and so he . . . perceives himself . . . as this hard worker and wanting to make everybody feel proud of him and wanting to be accepted and fit in. But then he also has this conflict with not being sure whether he should go along with authority because he wants to make his own decisions, he wants to be autonomous.

The Conners 3 assessment was administered to provide a standardized assessment of ADHD-related symptoms which can impact risk (due to poor impulse control) and responsivity (due to difficulty maintaining attention and focus). Dr. Perez testified that, although Hernandez had reported that he had trouble paying attention throughout his life, during the Conners 3 he did not report any symptoms of ADHD. Dr. Perez stated that she

> can't say whether that was because he was under-reporting or whether he just does not have insight into those problems or he doesn't believe that he has those problems, [s]o it wasn't

very useful either. It wasn't something where I could make a diagnosis of ADHD or actually rule it out.

c. Risk Sophistication Treatment Inventory

Perez also had Hernandez complete the Risk Sophistication Treatment Inventory (RSTI) which is a forensic assessment designed specifically for transfer cases that involves "an extensive interview and then a rating sheet that the clinician fills out that looks at different factors that are associated with risk for future violence, developmental maturity and sophistication and treatment amenability." The RSTI takes into consideration the factors outlined in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2022) and assesses three different areas: risk for dangerousness, sophistication/maturity, and treatment amenability.

### i. Risk For Dangerousness

The risk for dangerousness
focuses on characteristics reflecting violence history, frequency of involvement in criminal activity, premeditation, leadership role in crimes, lack of remorse, and general disregard for others. It is comprised of three clusters: Violent and Aggressive Tendencies, Planned and Extensive Criminality (similar to severe Conduct Disorder), and Psychopathic Features (e.g., interpersonal callousness, leadership role in crime).

The cluster of "violent and aggressive tendencies" includes "problems with aggression, interpersonal aggression, aggression towards people, [and] aggression towards animals." The cluster of "planned and extensive criminality" measures "things like taking a leadership role, the degree of antisocial behaviors to date, [and] delinquent peers." The cluster of "Psychopathic Features" measures the lack of empathy, lack of guilt, lack of remorse, and manipulativeness. According to Dr. Perez, when the current alleged offenses were considered, Hernandez scored in the middle range for all three clusters included within the risk for dangerousness.

### ii. Sophistication/Maturity

The sophistication and maturity area "reflects levels of autonomy, internal locus of control, decision-making, and degree of emotional attunement; that is, developmental maturity." According to Dr. Perez, Hernandez' sophistication and maturity score fell in the high offender range which indicated "a maturity level that's higher than the typical delinquent male" meaning that he is becoming less dependent upon his parents to make decisions for him but is still significantly influenced by peers. Hernandez also has an understanding of behavioral norms and understands that crime is wrong. However, Dr. Perez noted that Hernandez had problems with cost-benefit analysis in that, when making decisions, the benefits of behaviors weigh more heavily to him than the consequences of his behaviors.

### iii. Treatment Amenability

The treatment amenability scale
reflects the degree and type of mental health disorders present, the level of motivation to engage in treatment, awareness of problems, anxiety about current circumstances,

expectations that treatment will be beneficial, consideration and tolerance of others and positive involvement by parents. Treatment amenability reflects how likely it is that a youth will respond favorably to an intervention/treatment. Low scores indicate treatment amenability is poor and treatment progress is likely to be slow. In comparison, high scores indicate good treatment prognosis.

The treatment amenability scale includes three clusters: psychopathology-degree and type, responsibility and motivation to change, and consideration and tolerance of others. Hernandez' overall score on the treatment amenability scale fell in the high offender range indicating a good prognosis.

### iv. Dr. Perez' Overall Impressions Regarding RSTI

Overall, Dr. Perez testified that Hernandez' scores on the RSTI indicated that Hernandez has the maturity to benefit from treatment, has the openness and willingness to change, and is progressing in his therapy. According to Dr. Perez, Hernandez would benefit from rehabilitative services offered through the juvenile court involving emotional regulation, anger management strategies, impulse control, problem-solving, decision-making, victim empathy, moral development, prosocial activities, and goal-setting. She also stated that individual, group, and family therapy are important. She further testified that even though Hernandez was 17 years old at the time of the hearing and even though Hernandez' case involved a homicide, "two years is an average to above average amount of time for a juvenile to be involved in treatment, especially . . . [if they are in] a residential intensive treatment program. [Those programs are] typically about a year to a year and a half." However, Dr. Perez acknowledged that she "rate[d] [Hernandez] as having serious antisocial behaviors" and "a delinquent peer group." She also acknowledged that, even though Hernandez was receiving interventions at DCYC beginning in February 2022, he was still involved in fights in May and August and that the Nebraska Department of Correctional Services offers "numerous opportunities" for services and interventions including clinical treatment.

### (c) Menendez Letter

Menendez' letter stated that, since February 2022, Hernandez had been meeting with him weekly for crisis intervention within DCYC. Menendez diagnosed Hernandez with adjustment disorder (unspecified). Menendez stated that Hernandez was in the "preparation" stage of change and recommended that Hernandez "continue to receive support in detention and work toward the 'Action' stage of change."

### (d) Driscoll Affidavit

Driscoll's affidavit set forth that she was familiar with services available to juvenile offenders in the Douglas County Separate Juvenile court which has a range of services available to juvenile offenders including mental health services, individual therapy – specifically cognitive behavioral therapy, family therapy, substance abuse therapy, intensive family preservation, victim empathy classes, appropriate decision making classes, community coaching, electronic monitor, and out- of-home placements including group home facilities, psychiatric residential treatment

facilities (PRTF) and commitment to Youth Rehabilitation Treatment Center at Kearney, Nebraska (YRTC-K). YRTC has treatment services including cognitive groups such as moral reconation therapy (MRT); aggression replacement therapy (ART), individual therapy, family therapy, adolescent community reinforcement approach programming (ACRA), education, and recreation. Driscoll's affidavit further set forth that the juvenile court "has the ability and authority to adjust and modify the level, or a range, of services available to a juvenile offender depending on the juvenile's success or lack thereof, making said services more rehabilitative and/or therapeutic as a given circumstance may warrant"; the juvenile court "conducts on-going, regular reviews of juveniles under the Court's jurisdiction to assess the appropriate level of services or sanctions to be provided while the juvenile remains under the Court's jurisdiction" and that it was her "professional opinion that if this matter was transferred to the [juvenile court], an evaluation, including but not limited to a chemical dependency, psychological, and psychiatric evaluations could be ordered to make recommendations regarding appropriate services and level of care for placement."

### 3. DISTRICT COURT ORDER

After the hearing, the district court entered a detailed 28-page order overruling Hernandez' motion to transfer to the juvenile court. The court found:

> While the Court is mindful that there is no arithmetical computation or formula required in a court's consideration of the statutory factors, the Court finds that a majority of the factors weigh in favor of the Court retaining this case in District Court. Given the serious nature of the charged offenses, the violence surrounding the facts of this case, the fact that [Hernandez] was in juvenile diversion when this incident took place, his age, and the safety and security of the public, the Court finds that the State has met its burden of establishing a sound basis for retention of jurisdiction. Having balanced public protection and societal security against the practical and non-problematic rehabilitee of [Hernandez], [his] Motion to Transfer to Juvenile Court shall be overruled.

## III. ASSIGNMENT OF ERROR

Hernandez contends that the district court abused its discretion in overruling his motion to transfer to the juvenile court because the State failed to meet its burden to show that a sound basis existed for the district court to retain jurisdiction.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

Hernandez argues that the district court abused its discretion in denying his motion to transfer because the State failed to meet its burden to show the case should not be transferred to the juvenile court. His brief discusses each of the statutory factors and argues error in each of the

factors that the district court found supported retaining jurisdiction. Specifically, he argues that the district court incorrectly characterized the results of the RSTI as self-serving and unreliable, made assumptions and/or misstatements that were not supported by the evidence, failed to provide reasoning for some of the court's conclusions, and failed to adequately consider Dr. Perez' testimony.

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, the allegations against Hernandez placed him within this category of juvenile offenders, and the State filed the charges against Hernandez in the district court.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer the case to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Cum. Supp. 2022). In the instant case, when Hernandez moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Cum. Supp. 2022):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court[.]" See § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by

which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

### 1. FACTORS FAVORING RETENTION

The district court reviewed and analyzed each of the factors contained in § 43-276(1) and found that the following factors weighed in favor of the district court retaining jurisdiction over Hernandez.

#### (a) § 43-276(1)(a) – Type of Treatment Amenable to Juvenile

The district court summarized the evidence presented by Dr. Perez but noted that Hernandez' "troublesome behaviors have progressed and intensified despite interventions." The court noted that Dr. Perez' testimony and opinions made "many assumptions" including that Hernandez' motivations for treatment were true and not based on the potential other option of going to prison if convicted in adult court; that Hernandez' motivation to do court-ordered treatment is true as opposed to his recent record of not completing his juvenile diversion for the third degree assault "which was much simpler to accomplish"; and that the juvenile court could immediately provide all recommended services including intensive residential individual treatment.

#### (b) § 43-276(1)(b) – Evidence of Violence in Alleged Offenses

The district court recounted that Hernandez was charged with four felonies and stated that [o]bviously murder is a violent act and the use of a gun to commit such murder is also viewed by the Court as a violent act. In the same vein, discharging a firearm at an occupied motor vehicle and using a gun to accomplish this is also viewed by the Court as a violent act.

The court also noted that the victim "suffered a gunshot wound to the left scapula, piercing her left lung, aorta, and her heart, causing her death."

#### (c) § 43-276(1)(c) – Motivation for Commission of Offense

The district court noted that Lopez stated he had been having problems with the "Get Money Squad" also known as "GMS." The court also noted that the front seat passenger in the victim's vehicle stated that he and Hernandez had been friends until a school fight occurred during which the passenger's friend was knocked out after which time Lopez and Hernandez had "a feud."

#### (d) § 43-276(1)(e) – Previous History of Juvenile

The court noted that, although Hernandez had not been previously adjudicated, he had been under the jurisdiction of the juvenile courts in both Douglas and Sarpy counties. Further, although Hernandez completed juvenile diversion for burglary in Douglas County, following his referral for juvenile diversion in Sarpy County for third degree assault, he failed to attend his check-in and

had not completed any community service hours. Following Hernandez' involvement in the current case, the Sarpy County charges were dismissed at the State's request.

### (e) § 43-276(1)(g) – Consideration of Public Safety

The district court found that

retaining jurisdiction in the District Court promotes the goals of specific deterrence (i.e., that individuals who commit crimes and are thereafter apprehended and punished will be deterred from engaging in future criminal activity) and general deterrence (i.e., that the general population will be deterred from offending when they are aware of others being apprehended and punished for their criminal activity. . . . holding a juvenile accountable in adult court for an unlawful killing can be a proper exercise of discretion by a district court.

### (f) § 43-276(1)(h) – Consideration of Juvenile's Ability
### to Appreciate Nature and Seriousness of Conduct

The court noted that, based upon Dr. Perez' testimony, Hernandez was at a higher level of sophistication and maturity than the average delinquent male and had at least average intelligence; that Hernandez was aware of, and understood, the wrongfulness of crime; Hernandez could understand the difference between right and wrong; and was aware his behavior has consequences. Based upon those factors, the court found that Hernandez had the ability to appreciate the nature and seriousness of his alleged conduct.

### (g) § 43-276(1)(i) – Best Interests and Security of Public

The district court noted that Hernandez had been charged with four felonies and that the juvenile court

would automatically lose jurisdiction over [Hernandez] when he turned 19 years of age, whether or not he had benefitted from the services provided to him. To date the Juvenile Court has provided, and [Hernandez] has received juvenile court diversion services in two separate juvenile court jurisdictions. [Hernandez] was actually on juvenile diversion in Sarpy County when the incident in this case happened. If convicted of a felony charge in this present case, it may appear [Hernandez] is not an appropriate candidate for adult probation and should continue in secure detention or under supervision for a period extending well beyond his minority.

### (h) § 43-276(1)(j) – Restorative Justice

The court noted that there was no evidence before the Court that Hernandez agreed to participate in restorative justice and the deceased victim could not participate in restorative justice. The court further noted that there was no evidence before the court that the other two victims who were in the victim's vehicle had agreed to participate in restorative justice.

### (i) § 43-276(1)(k) – Juvenile Pretrial Diversion

The district court found that

[b]ased upon the nature of the charged offenses and the fact that [Hernandez] was previously on juvenile diversion when the alleged incident took place, it does not appear to be a realistic possibility that [Hernandez] could participate in a pretrial diversion

program should this case be transferred to the Juvenile Court. [Hernandez] appears to require a higher level of supervision and structure than is available through a diversion program.

### (j) § 43-276(1)(l) – Conviction or Acknowledged Unauthorized Use or Possession of Firearm

The district court noted that the facts contained in police reports and preliminary hearing met the criteria that Hernandez had acknowledged the use or possession of a firearm.

### (k) § 43-276(1)(n) – Gang Membership

The court noted that witnesses stated that Hernandez belonged to a group known as GMS which either stood for "Get Money Squad" or "Get Money Soldiers." Additionally, during the burglary in which Hernandez was involved, at least one of the parties wrote a message including "LOMAS 13" on a wall of the residence. The court noted that "[t]he parties apparently wanted any benefits that may come from the victims believing the perpetrators were members of LOMAS 13."

### 2. FACTORS FAVORING TRANSFER

The district court found that two factors favored transfer of this matter to the juvenile court: § 43-276(1)(f) governing the juvenile's best interests and § 43-276(1)(m) governing whether a prior juvenile court order had been issued pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016). Regarding the juvenile's best interests, the district court noted:

> It very well may be that [Hernandez'] personal belief is that it is in his best interest[s] to be transferred to the Juvenile Court as opposed to being 1) a convicted felon, and 2) exposed to the possibility of serving a lengthy sentence of incarceration should he be convicted of the charged offenses.

Further, the court found that "[t]here is no previous finding from the Juvenile Court that [Hernandez] is not amenable to rehabilitative services that can be provided under the Nebraska Juvenile Code."

### 3. NEUTRAL FACTORS

The district court identified two factors in its analysis that it considered to be neutral: § 43-276(1)(d) governing the age of the juvenile and others involved and § 43-276(1)(o) relating to other relevant matters. The court noted that Hernandez was born in September 2005 which made him 16 years old at the time of the alleged offenses and 17 years old at the time of the hearing on the motion to transfer. The victim was 14 years old at the time of her death and the other two passengers also present in the victim's vehicle were 17 years old. There were four other passengers in the same vehicle as Hernandez; three of those passengers were 16 years old and the other passenger was 18 years old. We do note that, in its conclusion, the district court noted that Hernandez' age was a factor weighing in favor or retaining jurisdiction. In our review, we accept the court's more specific finding that Hernandez' age was a neutral factor and consider the reference to Hernandez' age supporting retention in the district court as a misstatement. Regarding § 43-276(1)(o), the court further found that no other considerations appeared to be applicable.

## 4. No Abuse of Discretion

Although the district court's analysis of factors under § 43-276(1) reveals only two factors favoring transfer to the juvenile court, there is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. See *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute. *Id.* It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.* "This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018).

As we often state in our review of juvenile transfer cases, these are difficult decisions for the trial court and for this court on appeal because of the young age of the defendants. However, a young age by itself does not support a transfer to the juvenile court. See *State v. Esai P., supra* (setting forth cases of defendants as young as 14 or 15 years of age in which criminal proceedings were retained in district court because factors favoring public protection outweighed juvenile's young age, such as involvement with gangs and guns, violent nature of crime, or unlikely success of rehabilitation before juvenile reaches age of majority).

Hernandez argues that "the district court's analysis of the factors, reasoning, and rulings were clearly untenable, resulting in an abuse of discretion." Brief for appellant at 14. Hernandez challenges the district court's findings regarding the factors that the court determined weighed in favor of retaining jurisdiction in the district court.

After reviewing the entirety of the record and the district court's order, we believe this case falls within the category of the "theme" this court expressed in *State v. Leroux, supra*. After summarizing numerous cases and their holdings, which we will not repeat here, this court held:

> The theme evident in the cases discussed above is this: When a juvenile commits a violent crime, the trial court is not likely to grant a request to transfer to the juvenile court because (1) the juvenile court will lose jurisdiction when the defendant turns 19 years of age which may not allow sufficient time for the complete rehabilitation of the juvenile, and therefore retention is necessary to ensure public safety, and (2) there is no secure youth detention facility available which can safely provide the appropriate services and treatment for a juvenile who has committed a more serious offense. This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated. The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes. . . .

> While in some of the cases discussed above, the aggressive, violent, or premeditated nature of the offense combined with the mental health or historic behaviors of the juvenile were such that it was clear that the services, facility options, and age limit of the juvenile system could not safely house and rehabilitate the juvenile before the juvenile court would

lose jurisdiction. In the instant case, it is less clear. Although the district court found many of the statutory factors favored transferring [the defendant] to the juvenile court, the court weighed more heavily its concerns for public safety, namely, that the time left to treat [the defendant] under the juvenile court's jurisdiction would not be sufficient and the security and services at the YRTC would not be adequate for someone convicted of more serious crimes, such as the ones at issue here.

*State v. Leroux*, 26 Neb. App. 76, 118-19, 916 N.W.2d 903, 929 (2018).

We note that the record in the instant case differs somewhat from *Leroux* in that an affidavit from the Douglas County juvenile court coordinator stated that "it was [her] professional opinion that the Separate Juvenile Court for Douglas County has services available to . . . Hernandez including but not limited to group home facilities, psychiatric residential treatment facilities (PRTF) and commitment to Youth Rehabilitation Treatment Center at Kearney, Nebraska (YRTC-K)." And although Dr. Perez opined that she believed Hernandez was amendable to treatment and that two years is generally a sufficient amount of time for a juvenile to be involved in treatment especially in a residential intensive treatment program, she also acknowledged that Hernandez suffered from serious antisocial behaviors, associated with a delinquent peer group, and was involved in altercations at DCYC even after receiving counseling. The district court noted that notwithstanding Dr. Perez' testimony regarding Hernandez' amenability to treatment, it was concerned with Hernandez' troublesome behaviors which had progressed and intensified despite prior interventions which mitigated against Hernandez' own statements governing his motivations for treatment and desire to be rehabilitated. Additionally, other factors enumerated in *Leroux* support retaining jurisdiction in this case including the violent nature of the offense, Hernandez' mental health, his prior behavior, that the juvenile court would lose jurisdiction when Hernandez turns 19 years of age which may not allow sufficient time for his complete rehabilitation, and that retention is necessary to ensure public safety.

The district court concluded here that the juvenile court's jurisdiction would not be sufficient given factors including the serious and violent nature of the charged offenses which involved the use of a firearm and resulted in the death of the 14-year-old victim, that Hernandez was on juvenile diversion when the charged offenses were committed, that Hernandez' "troublesome behaviors have progressed and intensified despite interventions," Hernandez' lack of participation in juvenile diversion for prior offenses, the court's concern for public safety, the fact that the juvenile court would automatically lose jurisdiction over Hernandez when he turned 19 years old regardless of whether he had benefited from services provided to him, and Hernandez' ability to appreciate the nature and seriousness of his conduct.

Based upon our review of the entire record including but not limited to the testimony of Dr. Perez and the affidavit of the Douglas County juvenile court coordinator along with our review of the district court's detailed order, we cannot say that the court's basis for retaining jurisdiction over Hernandez was not supported by appropriate evidence. When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Leroux, supra*. Given the evidence in this case, the majority of which supports the State's burden of proving a

sound basis for retaining jurisdiction in the district court, we cannot say the district court abused its discretion in declining to transfer Hernandez' case to juvenile court.

## VI. CONCLUSION

Finding no abuse of discretion by the district court in its decision to retain jurisdiction over Hernandez, we affirm the district court's order denying Hernandez' motion to transfer the proceedings to juvenile court.

AFFIRMED.